848 A.2d 803 (2004)
369 N.J. Super. 192
Kumar R. PATEL, M.D., Plaintiff-Respondent/Cross-Appellant,
v.
Jaime R. SORIANO, M.D., and Irvington General Hospital, Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 2004.
Decided May 18, 2004.
*804 *805 *806 *807 *808 *809 *810 Kevin McNulty, Newark, argued the cause for appellants/cross-respondents (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; John J. Gibbons and Mr. McNulty, on the brief).
Glenn A. Clark, Morristown, argued the cause for respondent/cross-appellant (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Mr. Clark, of counsel and on the brief; Edwin F. Chociey, Jr., on the brief).
Before Judges CARCHMAN, WECKER and WEISSBARD.
The opinion of the court was delivered by CARCHMAN, J.A.D.
Plaintiff Kumar A. Patel, M.D., a board certified surgeon with a subspecialty in vascular surgery, sought vascular surgical privileges at defendant Irvington General Hospital (IGH). According to plaintiff, defendant Jaime R. Soriano,[1] M.D., the chief of vascular surgery at IGH,[2] sabotaged plaintiff's application and communicated false statements about plaintiff to other members of IGH's medical staffÔÇöall to continue his own monopolistic control over IGH's vascular surgery department. As a result, plaintiff filed an action in the Chancery Division, seeking equitable relief as well as damages for both Soriano's and IGH's misconduct.
*811 Following an extended bench trial after transfer to the Law Division, the trial judge found in favor of plaintiff and concluded that both IGH and Soriano had defamed plaintiff and had tortiously interfered with plaintiff's reasonable expectation of economic advantage. In addition, she found that Soriano had violated the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19. The judge awarded joint and several damages including prejudgment interest and costs of $1,195,377.61 against IGH and Soriano, and $1,184,316.25, including prejudgment interest and costs, against Soriano individually. The judge dismissed plaintiff's breach of contract claim and concluded that IGH was immune from antitrust liability. Both defendants appeal and plaintiff cross-appeals.
We reach the following conclusions:
1) the trial judge's finding of liability for tortious interference was correct and is affirmed;
2) the judge's factual findings support a cause of action for trade libel rather than defamation and a judgment of liability for the former cause of action shall be entered on remand;
3) the judgment for liability and damages for antitrust violations is reversed;
4) the matter shall be remanded for reconsideration of damages on the causes of action for tortious interference and trade libel as well as punitive damages;
5) the cross-appeal is dismissed;
6) in all other respects the judgment is affirmed.

I.
After completing his medical training, plaintiff ultimately became board certified in both general and vascular surgery. In 1984, plaintiff was named chief of vascular surgery at Metropolitan Hospital, an 800-bed hospital in New York City where among his other duties, he oversaw Metropolitan's vascular laboratory. During his years of practice, plaintiff served as an associate professor of surgery at a medical college, was a member of several medical societies, authored numerous publications, served as a consultant to various insurance companies, and participated in numerous symposia and presentations to the medical profession.
Plaintiff became licensed to practice medicine in New Jersey in 1992. At that time, he decided to leave Metropolitan because of the perceived need to start a private practice in anticipation of his three children going to college. In 1993, plaintiff applied for and was granted attending physician privileges at Mountainside Hospital St. Joseph's Hospital, and Wayne General Hospital, all in New Jersey.
In February 1995, at the urging of a medical colleague, Dr. Shirish Patrawalla, plaintiff applied for vascular surgical privileges at IGH. Patrawalla, a cardiologist at IGH, felt that IGH needed a vascular surgeon and told plaintiff that other doctors at IGH shared this belief. Plaintiff claimed that Patrawalla told him that he could expect to perform thirty to forty percent of the vascular surgery procedures at IGH. However, Patrawalla also warned him to expect resistance from defendant, the chair of vascular surgery at IGH. Although he was not board certified in vascular surgery, defendant performed virtually all of IGH's vascular surgery procedures and maintained significant influence at the hospital through his membership on various committees and the board of trustees. Plaintiff decided to apply for privileges at IGH because he realized that he needed more than one hospital in which to develop his practice in vascular surgery and IGH appeared to be a promising opportunity for such development.
*812 In plaintiff's IGH application, he listed four referencesÔÇöDr. Roy Clauss, plaintiff's surgical colleague and immediate predecessor as chief of vascular surgery at Metropolitan; Dr. Herbert Dardik, a nationally renowned vascular surgeon at Englewood Hospital who was professionally acquainted with plaintiff; Dr. Kamalakar Ayyagari, on staff at IGH, but with whom plaintiff had never worked; and Patrawalla. All of these individuals wrote favorable letters of recommendation supporting plaintiff's application. No one from IGH informed plaintiff that his references were deficient.
Janice Nemeckay, IGH's director of medical staff affairs, oversaw the compilation of documents that comprised a doctor's application for medical staff privileges and would be reviewed by the various levels of peer review at the hospital. She contacted both the New Jersey Board of Medical Examiners and the New York Division of Professional Licensing Services and determined that plaintiff was a doctor in good standing in both states with no derogatory information reported. Nemeckay also reached out to every hospital where plaintiff had privileges as of February 1995. As part of plaintiff's application, he had signed releases which allowed IGH to obtain information about him from third parties. These releases all contained the following language: "You are hereby requested and authorized to furnish, make available and release to Irvington General Hospital, its medical staff and their authorized representatives all information concerning professional competence, ethics, character, and other qualifications relevant to my application for medical staff appointment and clinical privileges."
Dr. Francis Wyckoff, the head of surgery at Mountainside, completed the confidential evaluation form for plaintiff. Mountainside did not have a separate section for, or a separate director of, vascular surgery. Because plaintiff had been at Mountainside for less than two years when Wyckoff reviewed him, he was still under supervision at that hospital, a standard practice at most institutions. Wyckoff rated plaintiff "superior" in every category except one, in which he rated plaintiff "good." Wyckoff recommended "without reservation" that plaintiff be granted privileges at IGH "with supervision and observation as required in Irvington General's Dept. of Surgery." His impression of plaintiff was "favorable."
Dr. Joseph Farrell, a general surgeon and the acting chairman of surgery at St. Joseph's at the time of plaintiff's application to IGH, rated plaintiff "good" in all categories. Farrell considered plaintiff a "capable" applicant and recommended him for privileges "without reservation." The surgical department chair at Wayne General was unable to comment on plaintiff's application because plaintiff had little or no surgical activity at that hospital.
Dr. William Stahl, the chief of surgery at Metropolitan, also completed an evaluation form for plaintiff, rating plaintiff "superior" in all categories. Stahl considered plaintiff an "excellent individual and surgeon" and recommended him without reservation.
According to Nemeckay, plaintiff's completed application was referred to Dr. Capistrano Luzano, the director of the department of general surgery at IGH, for his recommendation. Luzano noted on his recommendation to the credentials committee that the "record speak[s] for itself and elected not to interview plaintiff.
This seemingly routine processing of plaintiff's application appeared on track when plaintiff met with defendant who, as chair of the surgery division and the director of vascular surgery, was next to *813 review plaintiff's file.[3] He interviewed plaintiff on June 13, 1995, the same day he reviewed the file. Plaintiff claimed that the interview was brief and defendant did not discuss plaintiff's references.
Defendant considered the interview to be cordial and uneventful and gave no indication that the application was deficient in any way. However, he wrote a letter to Patrawalla, the chairman of the credentials committee, asking that the committee postpone its interview of plaintiff since defendant was still obtaining information.
On June 29, 1995, Nemeckay notified plaintiff that his file was complete and that he would be interviewed by the credentials committee on July 12, 1995. On July 12, 1995, when plaintiff met with the committee, Patrawalla handed him a letter dated July 11, 1995, from defendant. According to this letter, which was addressed to plaintiff, defendant asked plaintiff to send him a list of all the surgical cases he had performed since September 1993. Plaintiff was also asked to include the following information: the patient's name, pre- and post-operative diagnosis, date and type of procedure performed, and any complications or mortality. The list was to be certified by the chief of vascular surgery or general surgery at the appropriate institution. The credentials committee informed plaintiff that defendant, not the committee, was requesting the information. The committee meeting minutes for July 12, 1995, stated that there was nothing adverse in plaintiff's file and that defendant had requested the delay in recommendation until the additional information was received. The committee agreed with plaintiff that defendant's request for two years' worth of information was "highly unusual."
Plaintiff felt that it would have taken an exhaustive effort to comply with defendant's request, since he would have had to pull each individual patient's chart and there were over one hundred cases at issue. Also, plaintiff concluded that defendant had not complied with IGH's own credentialing procedures since any deferral by a division chair had to be accompanied by a notice in writing to the applicant, stating the reasons for the deferral. Defendant's letter of July 11, 1995, did not inform plaintiff why the additional information was needed.
On July 13, 1995, the medical executive committee (MEC), including defendant, who was a member, met at IGH. According to the minutes of this meeting, there was a "lengthy discussion" regarding the appropriateness of defendant's "laborious request," given the lack of any negative credentials in plaintiff's file. Also, these minutes noted that defendant "elaborated on certain information received verbally (i[.]e.[,] high mortality rate and unsuccessful aneurysm surgery), which caused him to request such surgical information." No action was taken on plaintiff's application.
According to defendant, after his interview with plaintiff in June, he again reviewed plaintiff's application. Certain matters prompted his attention, such as plaintiff's failure to name as a reference any vascular surgeon at a hospital where he currently had privileges. Also, defendant *814 saw no reference from the director of vascular surgery at Metropolitan.
Defendant wanted to ensure that no quality of care issues surrounded plaintiff's decision to leave Metropolitan. Although the chief of general surgery at Metropolitan, Stahl, had given plaintiff a very positive evaluation, he was not a vascular surgeon, and defendant specifically sought to talk to the director of vascular surgery at Metropolitan. Defendant claimed that he placed three phone calls to Metropolitan, looking for the head of vascular surgery, and that he never received a return call. Defendant did not write a letter, nor did he contact Clauss, the vascular surgeon who had been plaintiff's immediate predecessor as chief of that department. Defendant surmised, incorrectly, that plaintiff and Clauss had been associated together in practice. Defendant claimed that if he had obtained a positive recommendation from the current director of vascular surgery at Metropolitan, that would have been the "end of the story."
Also troubling to defendant was the fact that the positive evaluation given by Wyckoff was accompanied by a caveat that plaintiff be given privileges "with supervision and observation." In defendant's opinion, that caveat was a "red flag" even though such supervision and observation is standard practice at most hospitals for a newly admitted surgeon's first two years. Defendant did not, however, call Wyckoff for clarification.
Instead, defendant placed a call to the main switchboard at Mountainside and asked for the head of vascular surgery. He was directed to Dr. Donald C. Syracuse, someone with whom defendant was familiar on a professional, but not personal, basis. Syracuse was a cardiothoracic surgeon who had privileges at Mountainside. About seventy-five percent of his practice was vascular surgery. He had never operated with plaintiff and had never seen him perform surgery.
According to defendant's contemporaneous handwritten notes of his conversation with Syracuse, which were later transcribed, Syracuse told defendant that: plaintiff had provisional status at Mountainside; plaintiff's mortality and morbidity rates were "higher than anyone else here"; plaintiff's first six aneurysm patients had complications and died; plaintiff's cases were discussed "almost every month" in mortality and morbidity conferences; and plaintiff should be asked to submit the cases he had done in the past one to two years. Syracuse declined defendant's request to put his comments in writing.
Defendant also placed a call to St. Joseph's and spoke to Dr. Nazmi Elrabie, the chief of vascular surgery. According to defendant's contemporaneous handwritten notes of that conversation, which were also later transcribed, Elrabie told defendant that plaintiff did not do much surgery at either St. Joseph's or Wayne General, and that most of his practice was at Mountainside. Elrabie also told defendant that plaintiff's privileges to read vascular lab studies at St. Joseph's were removed because he was "bad-mouthing" the three other doctors doing the readings, saying they "didn't know what they were doing."
At trial, Elrabie denied having said anything negative about plaintiff to defendant. He denied having said or implied that the decision to terminate plaintiff's lab privileges was because plaintiff "bad-mouthed" other doctors. Rather, Elrabie claimed that he told defendant only that a decision had been made by St. Joseph's surgical department's executive committee to require that doctors have their primary work at the hospital to be allowed to read the lab studies.
*815 Armed with the information he claimed to have received from Syracuse and Elrabie, unable to reach the head of vascular surgery at Metropolitan, and having consulted with counsel for the hospital,[4] defendant drafted his letter of July 11, 1995, requesting the list of all of plaintiff's surgical cases performed since September 1993. Defendant admitted that this letter did not notify plaintiff of the reasons for the request or deferral of plaintiff's application.
At the MEC meeting on July 13, 1995, defendant was asked to state those reasons. Defendant claimed that he was reluctant to divulge that information since he had not yet had a chance to verify what he had heard. Nevertheless, defendant admitted that he read to the committee the substance of his notes of his conversations with both Syracuse and Elrabie, including Syracuse's allegations about plaintiff's high mortality and morbidity rates and that his first six aneurysm patients died, as well as Elrabie's allegation that plaintiff "bad-mouthed" other doctors.
Plaintiff considered defendant's request for the information about his surgical cases a "declaration of war." In plaintiff's view, he would have to either withdraw his application or seek legal redress. He chose the latter and retained a lawyer, who immediately sent a letter to the president of IGH, objecting to defendant's request. Plaintiff's lawyer also noted that defendant had not notified plaintiff of the reasons for the deferral. On September 22, 1995, plaintiff himself wrote to Dr. Mahesh Desai, the president of IGH's medical staff, to note his objection, among other things, to defendant's review of his application as being an "obvious conflict of interest."
On October 5, 1995, the MEC, including defendant, met again. According to the minutes of this meeting, an "error" was noted on the MEC minutes for July 13, 1995. Those minutes should have read only that: "[Defendant] reported that he is awaiting information regarding [plaintiff's] surgical procedures during the past two (2) years, prior to submitting a recommendation." Notably, this "correction" meant that all reference to the lengthy discussion about defendant's "laborious request" was deleted, as was any reference to the verbal information received by defendant regarding plaintiff's high mortality rate and unsuccessful aneurysm surgery.
At this October 5 meeting, defendant told the MEC that he had not yet received a response from plaintiff regarding his request and that he would elaborate on his reasons for the request in a letter to plaintiffÔÇöa letter dated October 25, 1995, which plaintiff received shortly thereafter.
In that letter, a copy of which defendant sent to Romeo Tiu, who had replaced Desai as president of IGH's medical staff, defendant told plaintiff that during his review of plaintiff's application, he learned that plaintiff held only a provisional appointment at Mountainside Hospital. Since plaintiff had been at that hospital for two years, defendant inquired as to whether plaintiff had yet been promoted to full attending. Also, in further discussions with the chief of vascular surgery at Mountainside, defendant learned that plaintiff's mortality and morbidity rates were higher than those of other doctors performing the same procedures and that *816 plaintiff's cases were "consistently discussed almost every month." It was this information that prompted defendant to request the two-year list of plaintiff's cases, a request which defendant viewed as "prudent and not unreasonable."
Defendant also learned from the chief of vascular surgery at St. Joseph's that plaintiff's privileges to read non-invasive laboratory studies had been removed and defendant wanted to know the circumstances surrounding that removal. Finally, defendant sought clarification as to whether plaintiff sought privileges in general surgery or only vascular surgery.
Upon receipt of this letter, plaintiff noted several issues. First, Mountainside did not have a chief of vascular surgery. Second, plaintiff's mortality and morbidity rates were not higher than other doctors' rates, and plaintiff was unaware of any statistics that kept track of such information. Third, plaintiff's cases were not discussed "almost every month" at mortality and morbidity conferences. Prior to July 1995, plaintiff's cases had been discussed on only four occasions and at no time was a conclusion reached that plaintiff had provided inappropriate care.[5] Finally, plaintiff noted that St. Joseph's had decided, for economic reasons alone, to allow only those surgeons whose primary practices were at St. Joseph's to read laboratory studies. The decision did not affect plaintiff alone.
Plaintiff assumed that it was Syracuse who had spoken to defendant about plaintiff's practice at Mountainside, even though Syracuse was not chief of vascular surgery. According to plaintiff, Syracuse was "constantly" critical of him during mortality and morbidity conferences at Mountainside, often with no reasonable explanation and while ignoring basic surgical knowledge.
Plaintiff's attorney wrote to Syracuse, seeking verification of his statements to defendant, as reported by defendant. Syracuse responded in writing, telling plaintiff that he had been "misinformed" regarding the discussion he had with defendant. According to Syracuse, he told defendant to obtain a list of cases performed by plaintiff and their associated mortality and morbidity. He denied making the specific statements referenced in plaintiff's attorney's letter.
At trial, Syracuse contradicted defendant and claimed that his conversation with defendant was very brief. He denied having identified himself to defendant as the chief of vascular surgery at Mountainside. Syracuse admitted that he did not have any statistics regarding plaintiff's mortality and morbidity rates when he spoke to defendant and that he merely tried to convey an impression to defendant about plaintiff's performance. That is, he implied to defendant, truthfully, that plaintiff had more than a representative number of cases discussed at the mortality and morbidity conferences. Syracuse suggested to defendant that he obtain plaintiff's actual mortality and morbidity records or surgical logs. He admitted that the clear implication of this suggestion was that the records would reveal something negative about plaintiff, even though Syracuse was not aware of any instance where it had been found that plaintiff did not provide quality care. Syracuse denied telling defendant that plaintiff's first six aneurysm patients had died or that his cases were discussed every month. In fact, he denied discussing any specific cases with defendant. In essence, Syracuse refrained *817 from making a judgment about plaintiff, and merely asked defendant to do his "homework" so he could make his own judgment. He also denied that defendant ever asked him to put his comments in writing.
Syracuse also claimed at trial, though he denied it at a prior deposition, that he had heard many negative comments about plaintiff's performance from other doctors and nursing supervisors at Mountainside. He also claimed that Wyckoff, the chief of surgery, verbally expressed doubts to Syracuse about plaintiff's competence, outside of the mortality and morbidity conferences. All of these comments were reflected in Syracuse's overall impression of plaintiff when he spoke to defendant.
Plaintiff also wrote to and received a response from Dr. David Bregman, the chief of surgery at St. Joseph's. According to Bregman, Elrabie had decided that only those surgeons who worked primarily at that hospital should be allowed to read non-invasive vascular laboratory studies. Since plaintiff worked primarily at Mountainside, he was asked to stop reading those studies. The decision was purely a financial one and had nothing to do with the quality of care provided by plaintiff, who Bregman noted had "exceptional qualifications and experience in vascular surgery."
Plaintiff sent the written responses of Syracuse and Bregman, along with other material, to Tiu. On December 14, 1995, Tiu wrote to defendant, asking that defendant submit his recommendation regarding plaintiff prior to the next MEC meeting, which was scheduled for January 11, 1996.
Throughout the first half of 1996, the MEC met monthly. At each of these meetings, no action was taken on plaintiff's application because it was noted that the file remained incomplete and could not be considered as plaintiff had failed to comply with defendant's request. During this entire period of time, plaintiff and his attorney were corresponding with Tiu, insisting that a decision be made on plaintiff's application.
On March 29, 1996, plaintiff received notification from Mountainside that he had been promoted to an associate attending physician and that all supervision and observation had been removed. This information was passed along to IGH.
On July 18, 1996, Tiu sent a letter to defendant, with a copy to plaintiff, asking that defendant have his final recommendation ready for the next MEC meeting. The MEC met as scheduled on September 5, 1996, at which time a letter written by defendant to Tiu on September 4, 1996, was considered. According to that letter, IGH tried to accommodate plaintiff by allowing an outside vascular surgeon to review his cases and reducing the number of cases he had to submit to those performed within the last one year, instead of two years. The MEC noted that plaintiff did not intend to comply with the modified request and that defendant was therefore unable to make a recommendation for his appointment. Asserting incompleteness of plaintiff's application, the MEC voted to deny it.
Although the president of IGH sent plaintiff a letter dated September 6, 1996, notifying him of this denial, plaintiff apparently did not receive this letter until September 12. However, on September 9, 1996, plaintiff commenced litigation by filing his verified complaint and order to show cause in the Chancery Division, seeking final action on his application. On September 17, 1996, plaintiff requested a hearing to appeal the denial, pursuant to IGH's Medical Staff Fair Hearing Plan.
The next day, defendant filed a certification in opposition to plaintiff's order to show cause, detailing the telephone conversations *818 he had with Syracuse and Elrabie. This certification is significant because plaintiff claimed it was the first notice he had of these allegedly defamatory statements.[6] In his certification, defendant particularized the information he was told by Syracuse and Elrabie that he then related to IGH. This included references to mortality and morbidity rates, aneurysm-related deaths and denial of privileges to read vascular studies.
On October 1, 1996, counsel for IGH issued a subpoena duces tecum to Mountainside, seeking production of: (1) all documents and records discussing the surgical procedures performed by plaintiff at Mountainside since September 1, 1993, which were investigated or discussed at the hospital's mortality and morbidity meetings; and (2) the patient case files for every one of those surgical procedures.
On October 9, 1996, IGH provided plaintiff with transcriptions of the contemporaneous handwritten notes taken by defendant during his telephone conversations with Syracuse and Elrabie. According to these notes, both conversations took place on July 5,1995.
The Chancery judge entered an order directing defendants to withdraw their requests for information, as contained in defendant's letters to plaintiff of July 12 and October 25, 1995. He concluded that those requests were overbroad and violated IGH's credentialing procedures manual. Defendants were also directed to identify each questioned case of plaintiff's and to set forth in detail all the reasons for denying his application. In response to this order, IGH formally withdrew its request for the information.[7]
On February 4, 1997, IGH issued another subpoena duces tecum to Mountainside. This subpoena sought all documents relating to plaintiff's mortality and morbidity rates in connection with vascular surgical procedures at Mountainside, and for a comparison of plaintiff's rates to those of the other vascular surgeons at Mountainside with respect to the same procedures.
St. Barnabas Health Care System, IGH's parent corporation, retained Dr. Robert P. Shack to review the records generated at Mountainside for fourteen of plaintiff's patients. Shack was asked to provide an opinion as to the appropriateness and competency of the care rendered. More significantly, defense counsel thereafter wrote to the judge advising him that after reviewing six of the fourteen patient files, Shack concluded that plaintiff was performing "within the median standard of care" of a vascular surgeon. Accordingly, plaintiff's application for privileges at IGH would be considered at the credentials committee meeting scheduled for May 21, 1997, and at the MEC meeting scheduled for June 5, 1997. On June 5, 1997, the MEC met and voted to recommend approval of plaintiff's application to the board of trustees. On June 20, 1997, plaintiff was notified by the board of trustees that *819 he was granted a provisional appointment to the associate staff at IGH with privileges in general surgery and vascular surgery, operating under observation for major cases. Plaintiff's supervisor would be defendant.
Plaintiff never exercised those privileges; plaintiff contended that he could not work under the designated supervision of defendant. According to plaintiff, defendant would have to be present in the operating room, a situation that could present a danger to the patient since it would increase plaintiff's level of stress. Also, plaintiff would be obligated to tell his patients that he was being supervised by someone he had sued, a circumstance to which according to plaintiff no patient would consent. Plaintiff's application for relief from this supervisory requirement was denied.
On October 15, 1999, more than two years after having been granted privileges, plaintiff formally resigned from IGH's medical staff, citing the intolerable situation of defendant's supervision. Plaintiff claimed that IGH notified him that since he did not have any patient activity during his two-year provisional period, IGH would discontinue his privileges and report that fact to the National Practitioner Data Bank, a permanent registry that maintained information about any negative performance by a doctor. Plaintiff thus had the choice of voluntarily resigning or being reported as a physician whose privileges were discontinued. He chose the former, although his account of events was disputed by Dr. Amit K. Mody, the executive director of IGH who claimed that plaintiff told him that he would prefer to go his own way and had no intention of practicing at IGH.
Plaintiff claimed that in the more than two years he had privileges at IGH, only two cases had been referred to him there. Plaintiff also related how his practice at Mountainside had diminished dramatically. In 2000, he did only twenty-three procedures there. According to plaintiff's tax returns, in 1995 plaintiff's income was $302,000. In 1996, the first full year following his application to IGH, his income dropped to $181,000. Plaintiff claimed that everything changed for him at Mountainside in 1996, in that other doctors stopped discussing their cases with him. This had an impact on plaintiff professionally, since vascular surgeons depend on referrals from primary care doctors and other specialists for their patients. It also had an impact on him personally, since he considered it "a blessing" to be able to take care of patients and he was not prepared for the "political" side of private practice or for people who would undermine his reputation and view plaintiff as a threat to their own practice.
In 1997 plaintiff's income dropped even further, to $124,000. In early 1998, plaintiff applied for staff privileges at Valley Hospital in Ridgewood. He was accepted and also granted privileges to read vascular studies.[8] After he was granted privileges at Valley, his income increased to $185,000, and in 1999, it was $322,000. Plaintiff, capable of performing 250 or more procedures per year, was then performing about 100 to 120 a year.
Plaintiff also sought to establish defendant's alleged "monopolistic" control over vascular surgery at IGH. In 1999, 154 vascular surgery procedures were performed at IGH. Defendant performed all of them. In 1998, defendant performed 208 of the 219 vascular surgery procedures there; in 1997, 186 of the 188 procedures; in 1996, 133 out of 136; in 1995, 145 out of *820 153; in 1994, 150 out of 154; and in 1993, 153 out of 159. For his part, defendant claimed that general surgery represented seventy to seventy-five percent of his practice and that vascular surgery comprised the remaining twenty-five to thirty percent. Of all the vascular surgery defendant performed in a year, all but about twenty to thirty percent was derived from IGH. Defendant's tax returns from 1993 to 1999 showed a gross income of about $450,000 to $550,000 for each of those years. About five to ten percent of the income reflected in those returns was income from other sources.[9] To derive the amount of income generated by vascular surgery performed at IGH, one would have to deduct that five to ten percent, then deduct another seventy to seventy-five percent as income attributable to general surgery only, and then deduct another twenty to thirty percent as income attributable to vascular surgery performed at hospitals other than IGH.
Defendant admitted that the practice of vascular surgery was based on referrals and that to secure referrals, a vascular surgeon had to develop the trust and confidence of the other doctors on staff. He maintained that about five to ten percent of his vascular cases at IGH came to him from the IGH emergency room, and about sixty percent came from primary care doctors and other specialists at IGH. The remaining twenty to thirty percent came from current and former patients and doctors who did not use IGH as their primary hospital. He also maintained that his referrals came from other doctors he knew, other patients, and doctors he did not even know.[10] Defendant claimed that he was never the only vascular surgeon at IGH. At the time plaintiff applied for privileges, there were four vascular surgeons on staff, including defendant. As of the date of trial, one of the three resigned after defendant temporarily suspended him, one left to work at other hospitals, and one relinquished his privileges. Since plaintiff's application, two doctors had been granted vascular surgical privileges at IGH, and defendant had not noticed any diminution in his own practice or in the number of referrals.
Defendant admitted that no vascular surgeon could see a patient who had been admitted to or was in the emergency room at IGH unless that surgeon had privileges at the hospital. If a patient had vascular surgery done at IGH and had other medical problems, as was often the case with vascular surgery patients, the patient's other doctors would be "boxed out" of their care unless they too had privileges at IGH.
Since 1986 defendant had also been the director of the vascular laboratory at IGH. The laboratory was started at defendant's initiative. He offered to bring his own lab to IGH if he could run the lab, read all the tests, and bill for his professional services. Pursuant to his agreement with IGH, which was never reduced to writing, defendant had been the only reader of lab studies since the lab's inception, claiming such privilege by appointment of the board of trustees. He also claimed that no other doctor ever needed to read the studies since these studies were never done on an emergency basis, and he could read the studies by fax when he was away from the hospital.
*821 Dr. Ramesh Sawhney, an anesthesiologist who previously practiced at IGH until termination of his privileges, claimed that he spoke to Gerry Goodrich, the CEO of IGH, in 1995 about the need for another vascular surgeon at IGH. Goodrich was open to the suggestion and encouraged doctors to apply. Sawhney also claimed that over the years, he had spoken to many doctors about the need for a vascular-trained surgeon at IGH and defendant's running that department as a monopoly. Doctors were enthusiastic about plaintiff's decision to apply to IGH.
According to Sawhney, he once mentioned plaintiff's name to defendant when the two doctors were in the operating room together. Defendant said that he would not allow plaintiff to work in the hospital and that plaintiff was incompetent. Defendant also told Sawhney that he would never allow another vascular surgeon in "his" institution. Sawhney maintained that defendant, a very powerful individual at IGH, thought of the hospital as his to run. For example, he often barged into the administrator's office and told the administrator what he wanted done. Defendant also walked the hallways bragging that he could determine who would get privileges at the hospital. After defendant started questioning plaintiff's competence in connection with his application for privileges, other doctors at the hospital began to doubt plaintiff's abilities.
On cross-examination, plaintiff admitted that soon after he began practicing at Mountainside, i.e., before he ever applied for privileges at IGH, Syracuse and other doctors questioned the quality of his work during mortality and morbidity conferences. At these conferences, plaintiff's "competitors" made comments that either were inaccurate or distorted the facts. Plaintiff conceded that these doctors were making defamatory statements about plaintiff's practice long before he applied for privileges at IGH. At a prior deposition, plaintiff admitted that he was perceived as a threat by other doctors at Mountainside and that he attributed the decrease in his practice from 1995 to 1996 to their efforts to harm him. Plaintiff also admitted that there was a concerted effort at Mountainside to distort plaintiff's handling of his cases, an effort that started as soon as it became apparent that plaintiff's practice at Mountainside was expanding, a "substantial amount of time" before plaintiff applied to IGH. Plaintiff believed that Syracuse found in plaintiff's application for privileges at IGH the perfect opportunity to hurt plaintiff's Mountainside practice. This was consistent with other problems plaintiff had experienced at Mountainside resulting in meetings to discuss plaintiff's clinical performance and other derogatory comments regarding plaintiff's performance.
Plaintiff suggested that notwithstanding these negative comments at Mountainside, his income from that hospital actually increased in 1993 and 1994. His income dropped only in 1996, when IGH issued its subpoenas to Mountainside, which hurt plaintiff's reputation because "word gets around" that another hospital is looking at a doctor's mortality and morbidity statistics. However, plaintiff admitted that no one at Mountainside, or any other hospital, ever told him about hearing defendant's comments about him spoken at IGH's peer review committees, or refused to refer cases to him because of those comments or the subpoenas IGH issued to Mountainside. Plaintiff contended that defendant's comments made at IGH's MEC meetings were especially damaging to his reputation since doctors from every major department at the hospital attended those meetings and he relied on those doctors for referrals. He claimed that defendant's comments "poisoned the atmosphere" for *822 him in the "very small community" of Essex County, where negative news spread very fast. In contrast, the comments made about him at Mountainside were confined to departmental meetings, where only other surgeons were present. Those surgeons were his competitors, not referring physicians. Plaintiff admitted that theoretically, he could get referrals from doctors at one hospital and perform the vascular surgical procedure at another. However, in practice that never happened because ordinarily no reason existed to move the patient, such that most vascular procedures were done at the same hospital where the referring doctor practiced.
Both sides presented expert testimony with respect to the credentialing and privileging procedures at hospitals. According to plaintiff's expert, John Shershow, defendants violated the standard and fair practice for handling a doctor's application as well as the hospital's own bylaws and credentialing policies, and acted unreasonably and inappropriately in pursuing their request for more information from plaintiff. In Shershow's opinion, when a hospital questions an applicant's references, the standard and fair practice is to make follow-up phone calls to the doctors who wrote the references. If those calls do not answer all the questions, then the applicant may be asked to produce additional references. Standard practice requires contacting the department chairperson of any hospital at which the applicant practiced as well as contacting peer references provided by the applicant. Shershow opined that allowing an applicant's economic competitors to submit solicited or unsolicited comments without speaking to the applicant first was unfair practice.
Here, defendant was entirely unreasonable in failing to call the surgery department chiefs at Mountainside, St. Joseph's, and Metropolitan. Defendant also acted inappropriately when he called Syracuse, who had no position of authority at Mountainside, and Elrabie, who was the head of vascular surgery only at St. Joseph's. Assuming that defendant received negative information from Syracuse and Elrabie, defendant then should have asked them the bases for their statements and verified the specific concrete facts alleged. Most significantly, defendant should not have repeated these statements to the MEC without first confirming them. He should have merely asked the MEC for additional time to continue his investigation until the allegations could be resolved.
Shershow further believed that defendant's request to plaintiff for additional information was unprecedented and onerous. Both the credentials committee and the MEC should have refused to honor defendant's request for this information and either told defendant to call the surgery chief at Mountainside or made that call themselves. Also unprecedented was obtaining an external peer review of an applicant's records. Such a review is necessitated only when there is some internal adverse peer review or internal controversy. Finally, Shershow opined that it was unreasonable for IGH to expect plaintiff, once he got privileges at IGH, to be supervised by defendant, given the history of the litigation.
Shershow's opinion was not altered by the broad language contained in the waiver and release signed by plaintiff in connection with his application. The expert believed that the "universal expectation" of doctors was that the only people contacted would be the references given.
Eric Nelson Burkett, defendants' credentialing expert, opined that defendant acted in an appropriate manner to further investigate plaintiff's credentials. Except for Wyckoff, all of plaintiff's references were more than two years old. Additionally *823 Wyckoff was only a general surgeon and plaintiff should have offered a vascular surgeon at Mountainside or St. Joseph's as a reference. Burkett believed that it was within defendant's prerogative to go to any peer source he felt was authoritative. Finally, the release form signed by plaintiff, which gave defendant that right, was a standard one used by most hospitals, and defendant did not have to ask plaintiff's permission before making the phone calls beyond the submitted references.
Significantly, however, Burkett conceded that if the reviewer believes there is a conflict of interest, the reviewer should ask someone else to make the phone calls. Also, Burkett admitted that a request for one year of plaintiff's surgical cases probably would have been sufficient here. In previous deposition testimony, Burkett had indicated that defendant should have asked plaintiff for only six months of his cases or for only those cases which had complications. Nevertheless, Burkett maintained that defendant was entitled to the two-year list, as well as all of the accompanying information requested, to be able to ascertain whether any cases presented a quality of care problem. That Syracuse held no position of authority at Mountainside was irrelevant to Burkett. As a vascular surgeon, Syracuse was a peer of plaintiff and in a good position to evaluate plaintiff's performance over the past two years. Examining plaintiff's charts and records was the best way for defendant to verify what Syracuse told him.
According to Burkett, it was also appropriate for defendant to tell the MEC why he was withholding a recommendation on plaintiff's application. Burkett admitted, however, that once plaintiff's application was approved, it was not unreasonable for plaintiff to ask to be supervised by someone other than defendant.
On cross-examination, Burkett gave conflicting testimony with respect to whether defendant had violated the hospital's manual by failing to give plaintiff notice of the reasons for the deferral of his application. He also admitted that defendant should have asked himself whether any reference had an "ax to grind" with plaintiff. Burkett indicated that defendant should have called Wyckoff to reconcile the difference between Wyckoff's evaluation and Syracuse's accusations. Finally, Burkett admitted that if defendant fabricated or embellished the statements he attributed to Syracuse or Elrabie, then he would have breached his duty of fairness to plaintiff.
To challenge plaintiff's antitrust claims, defendants offered the testimony of Gerry Goodrich, a former State deputy commissioner of health who subsequently became president and CEO of IGH. Goodrich explained that in 1995 and 1996, thirteen hospitals were located in Essex County, making that county one of the more densely hospital-serviced communities in the nation. At least five other hospitals shared the same service area with IGH. Two of those hospitals, Newark Beth-Israel and St. Barnabas, were considerably larger than IGH, each having close to 600 beds and 20,000 to 30,000 admissions a year, compared to IGH's 157 beds and 4000 admissions. In addition, three of the five hospitals were full-service institutions, whereas IGH was a small medical surgical hospital, providing no obstetrical, pediatric, or other tertiary services.
Goodrich acknowledged that defendant was opinionated, voluble, envied, and controversial, but did not believe that defendant "got his way" at IGH more than any other doctor. Although defendant was the sole provider of the service of reading non-invasive lab reports, IGH also had exclusive contracts with several other doctors or groups of doctors for other types of services. *824 To Goodrich's knowledge, no one at IGH conspired with defendant to keep plaintiff from getting hospital privileges. IGH tried to have as many doctors as possible with privileges, because it meant more business. Mody, IGH's executive director, also confirmed that IGH was always recruiting doctors in all specialties, including in the vascular surgery area, to enhance services provided and bring in new patients.
In her written opinion, the trial judge made certain discrete findings that are relevant to our disposition of the appeal. The judge found that, in reviewing plaintiff's application, defendant's mission was to "protect his fiefdom" and to keep out qualified competition by any means possible and "at all costs." When faced with the "red flag" of Wyckoff's caveat that plaintiff be supervised and observed at IGH, defendant chose not to call the author of that note because he "knew in his heart" that Wyckoff would give plaintiff a very positive recommendation. Instead, defendant chose to call Syracuse, a competitor of plaintiff's. The judge also found that rather than call Wyckoff to verify the information given by Syracuse, defendant started an endurance test of "burdensome, inappropriate and unnecessary" requests to wear down plaintiff. Significantly, the judge found defendant's demeanor on the witness stand to be "arrogant and egotistical." The judge had no doubt about his motivation, with all of these findings relevant to the judge's ultimate finding that defendant was not a credible witness.
The judge further found that defendant published both Syracuse's and Elrabie's statements, later revealed as untrue, to the MEC. While she believed that both Syracuse and Elrabie had given negative information to defendant, she could not tell to what extent. She found that Syracuse was not a believable witness and that from his demeanor on the witness stand, "he clearly did not want to admit too much." While Syracuse denied making specific negative statements about plaintiff to defendant, he did admit to general criticisms about him. Elrabie flatly denied making the statements defendant attributed to him. In any event, according to the judge, defendant should have been more circumspect in the weight he gave to those statements and in the way he confirmed their veracity.
Plaintiff's income levels showed that his credentials and talent were in demand. Also, the evidence demonstrated that defendant had a "virtual lock" on the vascular surgery at IGH. The delay in completing plaintiff's credentialing process, coupled with the negative statements made about plaintiff in connection with that process, led other doctors at IGH to question plaintiff's competence. That meant fewer referrals and diminished income for plaintiff. Furthermore, the initial wrongful denial of privileges to plaintiff at IGH because of plaintiff's refusal to comply with defendant's unwarranted requests, prompted Mountainside to launch its own investigation into plaintiff's practices.
The judge also concluded that Shershow's expert testimony established that defendants violated standard practices in the way they processed plaintiff's application. Burkett, the defense expert, testified "quite incredibly" in the judge's opinion. He ultimately agreed with plaintiff that there had been no negative information in plaintiff's file before defendant made his phone calls, that someone other than defendant was designated to verify any allegations, and that defendant should have called Wyckoff for information about plaintiff's references and Syracuse's allegations. Moreover, at no time did anyone on the credentials committee or the MEC at IGH ask defendant, who generated a high number *825 of patients at the hospital, to modify his request. Rather, the members of both committees simply endorsed defendant's recommendations.
With respect to plaintiff's tortious interference claim, the judge found that plaintiff had been invited to apply to IGH and had been told that IGH had a need for more than one practicing vascular surgeon. Thus, he had a reasonable expectation that patient referrals and income would be forthcoming. The judge concluded that plaintiff, whose excellent credentials defendant recognized would make him a viable option for referrals, posed a threat to defendant's "virtual lock" on vascular surgery. This, in turn, would threaten to diminish defendant's own $500,000 annual income. Such risk prompted defendant to seek through discovery, embellishment or creation, negative information to keep plaintiff out of the hospital, or to delay the process so that plaintiff would withdraw his application out of fear or frustration.
The judge had no doubt that defendant had acted maliciously by failing to handle plaintiff's application fairly, his deliberate delays in violation of the hospital's credentialing procedures manual, and his interjection and publication of extremely damaging false information about plaintiff's competence. IGH was also responsible because its committees and their members did nothing to stop defendant's baseless hunt for negative information, and thus IGH acquiesced in defendant's conduct. The judge also found that plaintiff was damaged by defendants' tortious conduct. "Based upon [plaintiff's] income making ability at Mountainside and Valley Hospitals it is reasonable that he would have done the same at IGH had he been given timely privileges."
With respect to plaintiff's antitrust claims, the judge found that IGH was immune from such liability under N.J.S.A. 56:9-5(b)(5). However, defendant was liable because he acted not only as an agent of IGH, but also to protect his own income. The judge found that defendant held a monopoly in vascular surgery at IGH and worked to keep plaintiff out of that institution. As such, for purposes of analysis under the antitrust laws, IGH was the "relevant market."
With respect to plaintiff's defamation claim, the judge found that the statements made by Elrabie and Syracuse which defendant published "pierce one's heart [in] their severity." The comments, if believed, would end plaintiff's career. The same was true for the statements made by defendant to Sawhney. Defendant either fabricated the statements from general information he reviewed, or acted with malice and wanton disregard in failing to verify them. Nor did the committees at IGH verify the statements or ask defendant to do so. Moreover, the statements were meant to damage plaintiff's reputation. Because of the gossip about plaintiff's credential problems, he suffered harm with respect to his work at Mountainside.
The judge rejected plaintiff's breach of contract claim, finding that the law had not extended contractual rights to hospital procedural manuals which set forth appropriate procedures for granting privileges to hospitals. A contract was formed by by-laws only once privileges were granted. Moreover, the hospital's general duty of good faith did not equate with a contract.
With respect to damages, the judge found the loss due to the tortious interference and antitrust claims were the same, i.e., what plaintiff would have earned at IGH had he been granted privileges in September 1995 rather than September 1997. Defendant earned $1 million in that two-year period. The judge found that plaintiff reasonably could have received about twenty-five percent of defendant's *826 referrals; hence, his damages were $250,000. The damages to plaintiff due to defendant's defamatory statements were reflected in the years 1996, 1997, and 1998, when plaintiff's gross income substantially dropped from its 1995 high of $302,000. Notably, in 1999, plaintiff's income returned to over $300,000. The judge found that the loss in plaintiff's net income for this three-year period was $472,000, and that no proofs were presented to show any basis for this loss other than defendant's conduct. Plaintiff had also established emotional harm "as evidenced by his being on the verge of tears" when he testified. He clearly had suffered both personal and professional humiliation and had been deprived of the "blessing" of patient care. The judge believed that $250,000 was a "fair and reasonable" amount to compensate for this emotional harm.
The judge also found that defendant's conduct was "malicious and heinous," warranting a punitive damage award of $250,000. Such an award would punish defendant and send a message to deter others from similar conduct. The court later clarified that of the $250,000 awarded for tortious interference and antitrust, $125,000 represented a joint and several award against IGH and defendant for tortious interference, and $125,000 represented the award against defendant alone for antitrust. Plaintiff was entitled to treble that amount, or $375,000. The judge also awarded prejudgment interest and attorneys' fees, which are not disputed on appeal.

II.
We first address the issue of plaintiff's antitrust claim. Defendant challenges the judge's finding in favor of plaintiff, asserting that plaintiff failed to establish three elements of a viable antitrust cause of action: 1) the geographic market; 2) the product market as vascular surgery; and 3) defendant's exercise of monopoly power so as to cause injury to competition.
We start our analysis with the language of the statute. N.J.S.A. 56:9-3 sets forth the underlying proscriptive conduct: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." N.J.S.A. 56:9-4(a) follows and provides: "It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State." The dominant purpose of the New Jersey Antitrust Act (the Act), N.J.S.A. 56:9-1 to 19, is to advance public policy in favor of competition and to prevent practices that deprive consumers of the benefit of competitive markets. Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc., 282 N.J.Super. 140, 175, 659 A.2d 904 (App.Div.), certif. denied, 141 N.J. 99, 660 A.2d 1197 (1995).
N.J.S.A. 56:9-18 mandates that the Act "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." We look to federal jurisprudence to guide our interpretation of the Act. G & W, Inc. v. Bor. of E. Rutherford, 280 N.J.Super. 507, 512, 656 A.2d 11 (App.Div.1995); Van Natta Mech. Corp. v. DiStaulo, 277 N.J.Super. 175, 188, 649 A.2d 399 (App. Div.1994).
The federal analog to N.J.S.A. 56:9-3, the restraint of trade provision, is  1 of the Sherman Act (15 U.S.C.A.  1),[11] which *827 contains virtually identical language. Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 175, 659 A.2d 904. The issue is joined by the parties in their disparate interpretation of the applicable sections of the Act that apply here. Defendants analyze plaintiff's claim solely under N.J.S.A. 56:9-4, the monopolization provision, which is analogous to  2 of the Sherman Act, 15 U.S.C.A.  2.[12] Plaintiff urges that his claim is viable under N.J.S.A. 56:9-3 and invokes the "per se" rule of liability.
Unfortunately, we are constrained by the failure of the trial judge to analyze either provision of the Act or to set forth the statutory basis for the entry of judgment in favor of plaintiff. The trial judge's opinion on plaintiff's antitrust claim consisted of one paragraph and made no reference to either state or federal law.
IGH is immune by virtue of N.J.S.A. 56:9-(b)(5). Dr. Soriano is not. His conduct was dual in that he acted on behalf of IGH as to credentialing and on his own behalf in protecting his income. IGH wants qualified competent physicians to serve its patient population. If one, two or more vascular surgeons do the work the result is the same for IGH. That is not the case for Dr. Soriano. He has virtually been the only act in town. Dr. Soriano holds a monopoly in vascular surgery at IGH and worked to keep Dr. Patel out. The only way to do work and get referrals at IGH is to have privileges. That is the relevant market. All the previously cited facts support a finding against Dr. Soriano.
We set forth the basic principles regarding restraint of trade. Under N.J.S.A. 56:9-3, a plaintiff must prove the existence of a conspiracy in restraint of trade and either an unlawful purpose or an anti-competitive effect. Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 186, 659 A.2d 904. Unilateral action, regardless of its motivation, cannot constitute a violation of N.J.S.A. 56:9-3. Id. at 187 n. 3, 659 A.2d 904 (citing Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 110 (3d Cir.1980)). Instead, plaintiff must establish a unity of purpose, a common design and understanding, or a meeting of the minds in an unlawful arrangement between, at minimum, two independent, self-interested economic entities. Urdinaran v. Aarons, 115 F.Supp.2d 484, 488 (D.N.J.2000). Such a proof must be made by direct or circumstantial evidence that tends to prove a common scheme designed to achieve an unlawful objective. Brown v. Our Lady of Lourdes Med. Ctr., 767 F.Supp. 618, 630 (D.N.J.1991), aff'd o.b., 961 F.2d 207 (3d Cir.1992). An antitrust conspiracy where hospital surgical privileges have been denied cannot be inferred from the mere opportunity or ability to conspire. Id. at 629-30; Petrocco v. Dover Gen. Hosp. & Med. Ctr., 273 N.J.Super. 501, 525, 642 A.2d 1016 (App.Div.), certif. denied, 138 N.J. 264, 649 A.2d 1284 (1994). Even if the ultimate peer review decision is consistent with the economic interests of a competitor, conspiracy cannot be inferred "from whole cloth." Urdinaran, supra, 115 F.Supp.2d at 488.
Moreover, "[t]here can be no [ ] contract, combination or conspiracy by a corporation ... with its own officers, *828 agents or employees, who are performing their usual job of formulating and carrying out its managerial policy." Exxon Corp. v. Wagner, 154 N.J.Super. 538, 545, 382 A.2d 45 (App.Div.1977); see Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628, 642 (1984) (stating that employees of same company do not provide plurality of actors necessary for conspiracy under  1 of the Sherman Act). For that reason, a hospital is incapable of conspiring with its staff in deciding whether to grant staff privileges. Petrocco, supra, 273 N.J.Super. at 524, 642 A.2d 1016.
The Third Circuit has similarly held that a hospital cannot conspire with its executive or medical staff committees. Nanavati v. Burdette Tomlin-Mem'l Hosp., 857 F.2d 96, 117-18 (3d Cir.1988), cert. denied, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989); Weiss v. York Hosp., 745 F.2d 786, 817 (3d Cir.1984), cert. denied, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). While each medical staff member has an independent economic interest in competition with one another, thus satisfying the concerted action element of a restraint of trade claim, the staff as an entity has no interest in competition with the hospital and, in fact, operates similarly to an officer of a corporation who makes decisions on behalf of the corporate entity. Nanavati, supra, 857 F.2d at 118; Weiss, supra, 745 F.2d at 817. But see Islami v. Covenant Med. Ctr., Inc., 822 F.Supp. 1361, 1381-82 (N.D.Iowa 1992) (noting the split in circuits on this issue and an exception to the rule where agents have a personal stake involved).
Applying these principles here, we conclude that plaintiff did not demonstrate the concerted action element of a restraint of trade claim under N.J.S.A. 56:9-3. The trial judge found that defendant acted in a dual capacity as an agent of the hospital and in his own capacity to further his own economic interests. While that finding is supported by the record, the judge also found that IGH had absolutely no economic interest in preventing plaintiff from getting privileges since, as the evidence showed, the hospital either would gain from having additional doctors or would suffer no detriment. Only defendant would lose from the presence of competitors.
There was no proof that defendant conspired with anyone, much less IGH or one of its agents. That IGH may have acquiesced to defendant's unreasonable demands and chosen to let him "run the show" is not proof of an unlawful agreement between two separate and independent entities.
Plaintiff also failed to prove the necessary unlawful purpose or anticompetitive effect for a claim under N.J.S.A. 56:9-3. A restraint of trade claim can be evaluated by two methods: the rule of reason, and the per se rule argued by defendant. Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 175, 659 A.2d 904.
Under a per se analysis, plaintiff need prove only the existence of an illegal agreement and defendant's anticompetitive intent; anticompetitive effect is presumed. Id. at 178, 186, 659 A.2d 904. However, the per se rule is reserved for plainly anticompetitive practices, such as price-fixing and tying arrangements, which are always considered harmful to competition. Id. at 177, 659 A.2d 904; G & W, Inc., supra, 280 N.J.Super. at 513, 656 A.2d 11; EZ Sockets, Inc. v. Brighton-Best Socket Screw Mfg. Inc., 307 N.J.Super. 546, 552, 704 A.2d 1364 (Ch.Div.1996), aff'd, 307 N.J.Super. 438, 704 A.2d 1309 (App.Div.1997).
Both the United States Supreme Court and our Supreme Court have been reluctant *829 to extend the per se rule, especially in the context of hospital-doctor associations. See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 16, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2, 15 (1984) (tying arrangement between hospital and group of medical specialists does not warrant per se invalidation absent proof of market power); Desai v. St. Barnabas Med. Ctr., 103 N.J. 79, 97-98, 510 A.2d 662 (1986) (hospital-doctor associations are not inherently anticompetitive).
We reject the application of the per se rule of liability here. Even assuming that defendant and IGH acted in concert, there was no evidence of plainly anticompetitive conduct on the part of these defendants that should relieve plaintiff of the burden of proving anticompetitive effect. Most significantly, the judge made no such finding of such conduct. Although plaintiff relies on defendant's overwhelming market share to prove a per se restraint of trade, his analysis rests on what we determine to be the improper assumption that the relevant market was IGH, a subject we address, infra.
Under the rule of reason, only restraints of trade that are "unreasonably restrictive of competitive conditions" are illegal. Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 175, 659 A.2d 904 (citing Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 60-66, 31 S.Ct. 502, 516-18, 55 L.Ed. 619, 645-47 (1910)). The focus is on whether the conduct adversely affects competition. A trial judge must closely examine the relevant product and geographic markets and evaluate the effect of the defendant's conduct on that market. Pomanowski v. Monmouth Cty. Bd. of Realtors, 89 N.J. 306, 315-16, 446 A.2d 83, cert. denied, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 176, 659 A.2d 904; EZ Sockets, Inc., supra, 307 N.J.Super. at 553, 704 A.2d 1364. The fact that the conduct may have an injurious effect on an individual competitor is irrelevant. Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 176, 659 A.2d 904; EZ Sockets, Inc., supra, 307 N.J.Super. at 553, 704 A.2d 1364; see Urdinaran, supra, 115 F.Supp.2d at 489 (interpreting federal statute).
The balancing process under the rule of reason requires defining the market in which the restraint operates, evaluating the evils inherent in the conduct, and weighing those anticompetitive influences against any pro-competitive justifications. Pomanowski, supra, 89 N.J. at 315-16, 446 A.2d 83; Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 176, 659 A.2d 904. Proof of adverse effects on profits is insufficient as a matter of law. Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 188, 659 A.2d 904. "Actual or probable harm to competition is essential under a reasonableness approach." Ibid. "The consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him a competitive price and quality." Id. at 188-89, 659 A.2d 904 (quoting Prods. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos., 682 F.2d 660, 663-64 (7th Cir.1982)).
The analysis is similar for a monopolization claim under N.J.S.A. 56:9-4. A plaintiff must show that defendants have a dangerous probability of achieving monopoly power in the relevant market. Van Natta Mech. Corp., supra, 277 N.J.Super. at 188, 649 A.2d 399; see Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 877 (3d Cir.1995) (interpreting  2 of Sherman Act). A defendant is prohibited from using its monopoly power to gain a competitive advantage by destroying or eliminating its competitors. G & W, Inc., supra, 280 N.J.Super. at 513, 656 A.2d 11. *830 Monopoly power is defined as the power to control prices or exclude competition in the relevant market. Ibid. The likelihood of achieving a monopoly is demonstrated through a market share sufficient to create a monopoly. Van Natta Mech. Corp., supra, 277 N.J.Super. at 188, 649 A.2d 399. To demonstrate a monopoly under  2 of the Sherman Act, a plaintiff must prove "possession of monopoly power in the relevant market and [ ] willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[13]Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265, 292-93 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778, 786 (1966)); Urdinaran, supra, 115 F.Supp.2d at 491; Brown, supra, 767 F.Supp. at 630.
The critical issue under both analyses is demonstration of the relevant market. Where a plaintiff fails to adduce any proofs regarding market area or monopoly power, any antitrust claim will fail and must be dismissed as a matter of law. Desai, supra, 103 N.J. at 99, 510 A.2d 662. See Belmar v. Cipolla, 96 N.J. 199, 213-18, 475 A.2d 533 (1984); Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 190, 659 A.2d 904. Moreover, since the market power necessary for a monopolization claim requires something more than the market power necessary for a restraint of trade claim, a plaintiff who fails in its proofs for the latter will also fail in its proofs for the former. Urdinaran, supra, 115 F.Supp.2d at 491.
The relevant geographic market is the area in which potential buyers may rationally look for the goods or services they seek. It is the area where customers look to buy products, not the area where the seller attempts to sell its product. Id. at 490. In the case of hospitals, the geographic market inquiry focuses on the area within which hospital "customers" can turn to other "sellers" (hospitals) if the hospital raises prices or restricts output. Brown, supra, 767 F.Supp. at 630. A judge must consider, among other factors, whether the hospital is near major metropolitan areas and whether those areas also have hospitals. See id. at 631. Absent an allegation that a hospital exclusively serves a particular area or offers a unique set of services, an antitrust plaintiff may not limit the geographic market to a single hospital. Brader, supra, 64 F.3d at 877.
In Urdinaran, supra, 115 F.Supp.2d at 489, the district court held that a plaintiff failed to prove the elements of an antitrust claim where he alleged no more than a decline in his business as a result of the loss of his privileges at the Atlantic City Medical Center, and where he failed to provide any evidence of rising prices or a decline in the quality of care to customers in the geographic area. The court also noted that surgical patients in the Atlantic City area might take advantage of medical facilities as far away as Philadelphia. Id. at 490.
Similarly, in Belmar, supra, 96 N.J. at 201, 475 A.2d 533, the Supreme Court was faced with a challenge to a hospital's decision to enter into an exclusive contract with a group of anesthesiologists for the *831 provision of all anesthesiology services at the hospital. The Court refused to find any antitrust violation where the record was devoid of any proof that patients were forced to use the services of those doctors as a result of the hospital's market power. Id. at 218, 475 A.2d 533. Plaintiffs offered no evidence of the relevant market area for anesthesiological services and rested their case on the sole fact that the choice of anesthesiologists at that one hospital was limited to doctors comprising that one group of doctors. Ibid. The record also showed that there were four other hospitals within a ten-mile radius of the defendant hospital, and that the defendant hospital had forty-five percent of the share of the market in its "primary area" and eighteen percent of the market in its "secondary area." Id. at 213, 475 A.2d 533.
Applying these principles here, we conclude that the judge's finding of violation of the Act must be reversed. Plaintiff produced nothing to support a finding regarding defendant's market power and, like the plaintiffs in Belmar, rested his case on the sole fact that patients at IGH would be limited to using defendant as their vascular surgeon.
If anything, defendants established in their case in chief that the relevant geographic market for vascular surgical services in the community in which IGH was located is not limited to IGH. There are numerous other hospitals in Essex County, even disregarding the readily accessible New York hospital market, including many hospitals that are larger and provide a fuller range of services than IGH.
Most significantly, any relevant inquiry for purposes of antitrust law is the effect on consumers, not on an individual competitor. Defendant's conduct did not restrict the quality or price of vascular surgical services in and around Essex County, and plaintiff's claim must fail. Plaintiff failed to demonstrate that IGH was the only hospital in the community providing these services. That defendant was the sole provider of such services at IGH was irrelevant. Likewise irrelevant for the purposes of application of the Act is that defendant acted improperly in making himself the sole provider of services at IGH. The antitrust laws are not intended to replace the common law of unfair competition or to afford remedies for all business torts. Ideal Dairy Farms, Inc., supra, 282 N.J.Super. at 185, 659 A.2d 904. Whereas the law of unfair competition is grounded in ethical considerations, antitrust law is grounded solely in economic considerations and requires specific proof for recovery. Ibid. That proof was sorely lacking here. The judge should have dismissed plaintiff's antitrust claim.

III.
We reach a different result on plaintiff's claim for tortious interference.
To establish a cause of action for tortious interference with a prospective economic advantage, a plaintiff must prove that he had a reasonable expectation of advantage from a prospective contractual or economic relationship, that defendant interfered with this advantage intentionally and without justification or excuse, that the interference caused the loss of the expected advantage, and that the injury caused damage. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52, 563 A.2d 31 (1989). On appeal, defendants challenge only the first element of proof. That is, they claim that plaintiff failed to prove that his expectation of future vascular surgery referrals was reasonable or rose to the level of a protectable interest.
The protected interest need not rise to the level of an enforceable contract. *832 Jenkins v. Region Nine Hous. Corp., 306 N.J.Super. 258, 265, 703 A.2d 664 (App. Div.1997), certif. denied, 153 N.J. 405, 709 A.2d 798 (1998). Instead, plaintiff must demonstrate that without the interference, there was a reasonable probability that he would have received the anticipated economic benefits. Lamorte Burns & Co. v. Walters, 167 N.J. 285, 306, 770 A.2d 1158 (2001); MacDougall v. Weichert, 144 N.J. 380, 404, 677 A.2d 162 (1996).
The record clearly supported the judge's findings and conclusion that but for defendants' malicious interference with plaintiff's application for privileges, that application would have been approved. It is true that, once approved, plaintiff was not guaranteed any particular percentage of the referrals at IGH. Moreover, plaintiff's reliance on Patrawalla's optimistic prediction that he would receive thirty percent of the vascular surgery referrals was unfounded. Nevertheless, these are damage rather than liability issues. They did not bar plaintiff from any recovery, especially as it was undisputed that without privileges, a doctor cannot perform any surgery at that particular institution. The issue, then, was not whether plaintiff proved a loss to a reasonable expectation of economic advantage, but the extent of that loss, an issue we address, infra.
We affirm the judgment of liability on plaintiff's tortious interference claim.

IV.
Defendants argue that the judgment in plaintiff's favor on the defamation claim must be reversed because this claim was barred by the one-year statute of limitations; the evidence failed to establish that the alleged defamation caused plaintiff the damages found by the judge; and plaintiff failed to show knowledge of falsity or reckless disregard for the truth, the appropriate standard when a qualified privilege applies.
With respect to the time bar issue, plaintiff responds that defendants waived this defense by failing to plead it as an affirmative defense; that his claim was for trade libel, not defamation, and was therefore governed by a six-year statute of limitations; that the equitable tolling and fraudulent concealment doctrines applied; and that his amended complaint related back to the filing date of the initial verified complaint.
Although we need not address the issues of waiver, equitable tolling, fraudulent concealment or relation back as we now conclude that plaintiff did set forth a cause of action for trade libel that was not barred by the one-year limitation period, we first set forth the relevant statute and then recount the procedural background of this litigation to put our determination in context.
N.J.S.A. 2A:14-3 provides that: "Every action at law for libel or slander shall be commenced within 1 year next after the publication of the alleged libel or slander." However, N.J.S.A. 2A:14-1 also provides:
Every action at law ... for any tortious injury to real or personal property, for taking, detaining, or converting personal property, ... [or] for any tortious injury to the rights of another not stated in sections 2A:14-2 and 2A:14-3 of this Title,... shall be commenced within 6 years next after the cause of any such action shall have accrued.
On September 9, 1996, plaintiff filed his initial verified complaint in the Chancery Division, seeking to compel defendants to act on his application. At that point in time, plaintiff had not yet received notification that his application had been denied. Once that notification was received, apparently several days later, his complaint became one for relief from the onerous request *833 to supply two years' worth of his surgical records. That relief was granted by the Chancery judge in October 1996. In June 1997, plaintiff was finally granted the privileges he sought. Within a few months, he filed his amended complaint, which was transferred to the Law Division, tried and is now the subject of this appeal.
Plaintiff's initial complaint contained three counts: the first count alleged breach of IGH's credentialing procedures manual, bylaws, rules and regulations; the second count alleged tortious interference with plaintiff's prospective economic advantage and libel and slander which "adversely affected [plaintiff's] professional reputation and trade and business; " and the third count alleged violation of the antitrust statute (emphasis added).
As of the filing of this initial complaint, plaintiff did not yet know about the details of defendant's phone conversations with Syracuse and Elrabie. Those details were revealed in defendant's certification of September 18, 1996, filed in opposition to plaintiff's order to show cause. However, by virtue of defendant's October 25, 1995, letter to plaintiff, plaintiff already knew that defendant had spoken to doctors at Mountainside and St. Joseph's who had allegedly transmitted negative information about plaintiff. Plaintiff also knew that Tiu had been copied on this letter. Moreover, plaintiff suspected that it was Syracuse to whom defendant had spoken at Mountainside, because plaintiff's attorney immediately wrote to Syracuse for his response to these allegations. Although Syracuse denied making the specific statements attributed to him, he did admit that he told defendant to obtain a list of plaintiff's cases.
We cannot discern from the record at what point plaintiff found out that on July 13, 1995, defendant related to the MEC what he learned from Syracuse. It was not disputed that on October 5, 1995, the MEC voted to redact the minutes of the July 13 meeting. However, the original minutes for July 13 were made available to plaintiff at some point in discovery following the filing of the initial complaint.
Plaintiff's amended complaint filed on August 14, 1997, contained a separate count for defamation. In that count, plaintiff alleged that defendant had "in certain conversations that he had with and in the hearing and presence of certain persons, including but not limited to members of the Hospital's Medical Executive Committee, maliciously spoke and published of and concerning [plaintiff], certain slanderous, false, libelous, malicious, scandalous and defamatory words." Specifically, these words were the ones defendant told the MEC about his conversations with Syracuse and Elrabie. Plaintiff alleged that the slanderous statements injured and damaged him in his good name and reputation, "including but not limited to other physicians at the Hospital and the other hospitals where [plaintiff] holds privileges."
In their answer to plaintiff's amended complaint, defendants did not affirmatively plead the defense of the statute of limitations. However, they did plead the defense of failure to state a claim upon which relief could be granted. In November 2000, defendants filed a notice of motion to dismiss the defamation claim on various grounds, including the one-year statute of limitations bar. Defendants argued that this was not a trade libel claim subject to a six-year statute of limitations. On February 26, 2001, the judge denied the motion. She found that the damages claimed by plaintiff went to the alleged interference with his ability to practice at IGH. Even if the one-year statute applied, defendants had waived the defense "by failure to so *834 plead and move in a timely fashion on that ground."
However, following trial, the judge reversed herself and found that defendants' pleading of "failure to state a claim" was sufficient to raise the statute of limitations defense. However, the claim was not time-barred because "[w]hen the statements were made and when [plaintiff] was able to determine when they were made was like chasing a moving target." Moreover, specific information was within defendants' control. While plaintiff's original complaint did not plead this cause of action "in so many words," the claim was there "by inference" and was within the knowledge of defendants, who knew that "negative statements" had delayed plaintiff's credentialing process. We disagree with the judge that this was a defamation case, and plaintiff was subject to the one-year limitations period. Our review of the record reveals that this cause of action should have been reviewed as one of trade libel where a six-year limitations period applies. Our determination renders moot any asserted error as to the application of the one-year limitations period.
We now address the principles of law applicable to plaintiff's asserted trade libel claim. Trade libel identifies the tort addressing aspersions cast upon one's business operation. The tort is also known as injurious falsehood, disparagement of property, or commercial disparagement. Prosser & Keeton on Torts  128 at 963 (5th ed. 1984) (Prosser & Keeton). However, the tort is broader in scope than any of those terms would indicate, and is probably as broad as any injurious falsehood which disturbs prospective advantage. Id. at 963, 967. It is similar to the tort of intentional interference with one's economic relations, rather than a branch of the general harm to reputation involved in libel and slander.
Id. at 964; see Henry V. Vaccaro Constr. Co. v. A.J. DePace, Inc., 137 N.J.Super. 512, 514, 349 A.2d 570 (Law Div.1975) (noting that "the tort of trade libel is but one part of a rather amorphous concept" consisting of communication to a third person of false statements concerning the plaintiff, his property, or his business).
A plaintiff alleging trade libel must prove publication of a matter derogatory to the plaintiff's property or business, of a kind designed to prevent others from dealing with him or otherwise to interfere with plaintiff's relations with others. Prosser & Keeton, supra,  128 at 967. The communication must be made to a third person and must play a material part in inducing others not to deal with plaintiff. Ibid.; Enriquez v. W. Jersey Health Sys., 342 N.J.Super. 501, 524, 777 A.2d 365 (App.Div.), certif. denied, 170 N.J. 211, 785 A.2d 439 (2001).
Certain differences between defamation and trade libel are significant. Whereas a defamation claim is subject to a one-year statute of limitations, a claim for trade libel is subject to the general six-year statute of limitations applicable to malicious interference claims. Crawford v. W. Jersey Health Sys. (Voorhees Div.), 847 F.Supp. 1232, 1239 and n. 7 (D.N.J.1994); Henry V. Vaccaro Constr. Co., supra, 137 N.J.Super. at 516, 349 A.2d 570. Also, whereas the need to demonstrate damages is waived in a defamation suit where the statement is oral, constitutes slander per se, and concerns conduct incompatible with the plaintiff's business, McLaughlin v. Rosanio, Ballets & Talamo, Inc., 331 N.J.Super. 303, 313-14, 751 A.2d 1066 (App.Div. 2000), proof of damages is essential in an action for trade libel. Prosser & Keeton, supra,  128 at 970-71.
Interference by falsehoods that cause pecuniary loss, but are not personally *835 defamatory, has been regarded as a tort "more or less distinct" from defamation. Id. at 962. Distinguishing between personal defamation of a plaintiff and disparagement of plaintiff's property may be difficult. Ibid. Generally, the latter tort has been applied to statements that are injurious to plaintiff's business, but cast no reflection on either plaintiff's person or property. Id. at 963. For example, if the statement charges plaintiff with personal misconduct, or imputes to plaintiff reprehensible personal characteristics, it is regarded as libel or slander. Id. at 964. If, however, the aspersion reflects only on the quality of plaintiff's product, or on the character of plaintiff's business as such, it is disparagement. Id. at 964-65; accord Restatement (Second) of Torts  626 comment d at 346 (1977) (noting that the rule of liability for trade libel applies "only when the matter published goes no further than to attack the quality of the thing in question and does not attack the personal character of its owner as vendor").
Many statements effectuate both harms. Prosser & Keeton, supra,  128 at 965. Some accusation of personal incompetence may be implied in imputations directed against a business or its product. Ibid. However, personal defamation is usually found only "where the imputation fairly implied is that the plaintiff is dishonest or lacking in integrity, or that he is deliberately perpetrating a fraud upon the public by selling a product which he knows to be defective." Ibid. No personal defamation will be found "where the most that can be made out of the words is a charge of ignorance or negligence." Ibid. Additionally, one may disparage plaintiff's business by reflecting upon its character, the manner in which it is conducted, or its popularity or danger, and not affect any property. Id. at 966.
The elements of a disparagement action include proof of publication of material derogatory to the quality of a plaintiff's business, or to his business in general, of a kind calculated to prevent others from dealing with him, or otherwise to interfere adversely with his relations with others. Id. at 967. To establish loss of trade or other dealings, plaintiff must show the falsehood was communicated to a third person and played a material and substantial part in leading others not to deal with plaintiff. Ibid. Plaintiff must also prove that the statement is false, and that defendant made the statement knowingly or recklessly. Id. at 967, 969-70. Finally, plaintiff must prove special damages, such as the loss of a present or prospective advantage, in the form of pecuniary loss. Id. at 964.
The special damages requirement goes to the cause of action itself, such that a plaintiff will be denied even nominal or punitive damages if he cannot show special damages. Id. at 970-71. The necessary showing is specific: plaintiff must establish pecuniary loss that has been realized or liquidated, such as lost sales, or the loss of prospective contracts with customers. Id. at 971. Traditionally, plaintiff was required to identify particular business interests who have refrained from dealing with him, or explain the impossibility of doing so. Id. at 972-73. However, where requiring such identification is unreasonable, proof of lost profits resulting from breach of contract may suffice, especially where the loss is shown with reasonable certainty and where the possibility that other factors caused the loss is satisfactorily excluded. Id. at 973.
General, implied, or presumed damages of the kind available in personal defamation actions do not satisfy the requirement of special damages needed for disparagement causes of action. Id. at *836 971. In addition, personal elements of damages, such as mental distress, are strictly excluded. Ibid.; Henry V. Vaccaro Constr. Co., supra, 137 N.J.Super. at 517, 349 A.2d 570.
The gravamen of a complaint for malicious intent to cause harm to one's business or employment is not the means used, but the wrongfulness of the defendant's intent. Strollo v. Jersey Cent. Power & Light Co., 20 N.J. Misc. 217, 223, 26 A.2d 559 (Sup.Ct.1942). It is not necessary to set out the words of the false representation. Van Horn v. Van Horn, 56 N.J.L. 318, 324, 28 A. 669 (E & A 1893). For such a cause of action, the more restricted statute of limitations for slander does not apply. Ibid.; Henry V. Vaccaro Constr. Co., supra, 137 N.J.Super. at 516, 349 A.2d 570.
Applying these principles here, we conclude that plaintiff established a cause of action for trade libel, in that he established that false statements made knowingly or recklessly about him by defendant caused him to lose referrals at IGH. The statements pertained solely to the character of the medical services provided by plaintiff and essentially charged plaintiff with negligence. Since the statements did not imply that plaintiff was personally dishonest, reprehensible, or lacking in integrity, they fall under the tort of trade libel, as opposed to personal defamation. Prosser & Keeton, supra,  128 at 964-65. We need not recount in detail the statements satisfying the trade libel cause of action. However, the finding of the trial judge as to the defamation cause of action satisfied the proofs necessary to support the trade libel cause of action. The statements regarding such matters as mortality and morbidity, aneurysm-related deaths, and even plaintiff's relationship with others on staff all were focused on his performance as a surgeon as opposed to personal defamation. We hold that plaintiff proved a trade libel cause of action.
Defendants contend that because defendant was qualifiedly privileged to utter the statements he did to the MEC, plaintiff had to prove that defendant knew those statements were false or that he uttered them with reckless indifference to their truth.[14] We conclude that the evidence supported the trial judge's finding that the privilege did not apply and defendant acted with the requisite knowledge or recklessness to abate the privilege.
We review the relevant legal principles. "A communication made bona fide upon any subject matter in which the party communicating has an interest or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty." Williams v. Bell Tel. Labs., 132 N.J. 109, 121, 623 A.2d 234 (1993) (citing Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 375, 149 A.2d 193 (1959) (citations omitted)); Govito v. W. Jersey Health Sys., Inc., 332 N.J.Super. 293, 309, 753 A.2d 716 (App. Div.2000); Bainhauer v. Manoukian, 215 N.J.Super. 9, 36, 520 A.2d 1154 (App.Div. 1986). The critical elements of this privilege are the appropriateness of the occasion on which the information is published, the legitimacy of the interest sought to be protected or promoted, and the pertinence of the receipt of the information by the recipient. Govito, supra, 332 N.J.Super. at 309-10, 753 A.2d 716; Bainhauer, supra, 215 N.J.Super. at 37, 520 A.2d 1154.
The privilege is based on the public policy that it is essential that true information be given whenever it is *837 reasonably necessary for the protection of one's own interests, the interests of third persons, or certain interests of the public. Erickson v. Marsh & McLennan Co., 117 N.J. 539, 563, 569 A.2d 793 (1990) (citing Restatement (Second) of Torts  592A at 258 (1965)). A defendant abuses the privilege if he knows the statement is false or acts in reckless disregard of its truth or falsity, if publication serves a purpose contrary to the interest sought to be promoted by the privilege, or if the statement is excessively published. Williams, supra, 132 N.J. at 121, 623 A.2d 234; Govito, supra, 332 N.J.Super. at 312, 753 A.2d 716; Bainhauer, supra, 215 N.J.Super. at 42-43, 520 A.2d 1154. The question of abuse is for the factfinder and must be proven by plaintiff by clear and convincing evidence. Williams, supra, 132 N.J. at 121, 623 A.2d 234; Erickson, supra, 117 N.J. at 565-66, 569 A.2d 793; Govito, supra, 332 N.J.Super. at 312, 753 A.2d 716.[15]
To overcome the privilege on the ground that defendant conducted a reckless investigation, a plaintiff must establish that defendant knew the statement was false or acted in reckless disregard of its truth or falsity. Govito, supra, 332 N.J.Super. at 316-17, 753 A.2d 716. The standard is whether defendant published a statement while entertaining serious doubts about the statement's truth. Id. at 318, 753 A.2d 716. Errors of interpretation or judgment and misconceptions are insufficient. Id. at 316-17, 753 A.2d 716.
Applying these principles here, there was sufficient evidence in the record for the judge to conclude that defendant abused the qualified privilege extended to members of peer review bodies when he made the defamatory statements to the MEC for the sole purpose of keeping his competitors out of the hospital and to protect his own "fiefdom." Although the judge never expressly analyzed the issue in terms of privilege and abuse, nor explicitly stated that defendant acted in reckless disregard for the truth, those findings were implicit in her conclusion that defendant either fabricated or embellished the information given to him by Syracuse and Elrabie.
Moreover, although defendants argue that defendant could not have been reckless, since he reasonably tried to investigate the information given to him by asking plaintiff to supply a list of his surgical cases, that conclusion was one for the trier of fact to reach based on the evidence presented. Both sides presented expert testimony that touched on this issue. As the judge noted, defendants' expert not only testified quite incredibly but also supported plaintiff's expert's conclusions. Defendants' expert conceded that defendant should not have called a competitor of plaintiff's and that he should have called Wyckoff directly. Based on the deference given to the findings of fact of judges sitting without a jury, Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84, 323 A.2d 495 (1974), we will not disturb these findings.
Since the trial judge found that defendant abused his qualified privilege as a member of a peer review body, such abuse precludes reliance on the principle here as well. In trade libel actions, as in defamation actions, an abuse of a qualified privilege will be found if the publisher knows the statement is false or acts in reckless disregard of its truth, if the publication serves a purpose contrary to the interests of the privilege, or if there is *838 excessive publication. Kass v. Great Coastal Express, Inc., 152 N.J. 353, 356, 704 A.2d 1293 (1998). That was the case here.

V.
We now address the issue of damages. As to the defamation claim, the judge found that the loss to plaintiff as a result of the false statements made about him were reflected in the years 1996 to 1998. Even though the judge decided this in the context of a defamation cause of action, in considering a cause of action for trade libel, our analysis remains the same. But a more significant issue arises as to the damages awarded.
First, the judge awarded plaintiff damages in the amount of $250,000 for the emotional harm he suffered as a result of the defamation. The judge found that plaintiff was near tears when he testified, that he suffered personal and professional humiliation, and that he was deprived of the "blessing" of taking care of patients. This aspect pertains solely to the personal element of plaintiff's damages and is strictly excluded under the tort of trade libel. Recovery for emotional distress under this cause of action is barred. We vacate that portion of the award.
Additionally, the judge assumed that plaintiff's decreased income resulted from defendant's defamatory conduct, absent any reason. This assumption included damage to plaintiff's reputation at Mountainside as an element of damages. Plaintiff's theory was that not only did the doctors at IGH refuse to refer their cases to plaintiff because of the defamation, but the doctors at Mountainside also stopped referring cases to plaintiff when they learned about IGH's allegations against him.
We question whether the evidence supported this theory. The evidence demonstrated that the accusations about plaintiff's competency were first made against him and originated at Mountainside. Even accepting, as we must, the trial judge's finding that defendant uttered false words to the MEC by fabricating or embellishing the information given to him by Syracuse, there was no dispute that Syracuse had indeed conveyed some negative information to defendant about plaintiff.
More importantly, plaintiff himself admitted that negative information about him was extant at Mountainside, long before he ever applied to IGH, though he vigorously denied the truth of any of those allegations. In fact, his defense to those allegations was much the same as his defense to the allegations made against him at IGHÔÇö that the allegations were motivated by the ill will of his economic competitors and circulated by doctors who possessed less knowledge and skill than he. Plaintiff also admitted that his cases were frequently discussed at mortality and morbidity conferences at Mountainside and that other surgeons at Mountainside were frequently, albeit incorrectly, impugning his medical competence.
We question, then, whether plaintiff sufficiently proved that the words uttered by defendant at the MEC meetings at IGH resulted in damage to his reputation at Mountainside. While plaintiff pointed to the subpoenas which IGH issued to Mountainside and to the fact that Mountainside launched its own investigation against him only days after Syracuse was deposed, the judge failed to make adequate findings as to causation and linkage between the conduct at Mountainside and the damages claimed.
Significantly, Mountainside's decision to investigate plaintiff was the result *839 of IGH's decision to investigate plaintiff, which in turn was the result of Mountainside's own negative comments about plaintiff. The judge was apparently impressed with the fact that notwithstanding the prior negative comments, plaintiff's Mountainside income did not start to decrease until after IGH started processing his application. Again, we are constrained by a lack of detailed analysis or findings as to this element of charges. While we question whether defendants should be liable at all for the decrease in plaintiff's income derived from Mountainside, on remand the judge should examine this issue and make specific findings as to whether defendant is responsible for the downturn at Mountainside.
The lost referrals at IGH for the period 1996 through 1998 are a different matter. Plaintiff received virtually no referrals from any doctor at IGH once he obtained his privileges, which plaintiff claimed was because every major player at the hospital was on the MEC and heard the defamatory statements uttered about him by defendant on July 13, 1995. While defendant noted that many factors went into a doctor's referral decision, that his own referrals came from many sources, and that it took a long time for a surgeon to build up a reputation at any particular institution, the judge properly awarded plaintiff damages for his lost IGH referrals based on the evidence presented.
In sum, we set aside the $250,000 for emotional harm as that element of damages is not viable in a claim for trade libel. The $472,000 in lost income on the now trade libel claim contains elements that must be revisited. Plaintiff is entitled to damages for lost income at IGH and the trial judge must, on remand, reexamine and make specific findings regarding the damages arising from lost income at Mountainside. On remand, the judge shall specifically identify those damages attributable to lost income at IGH and those lost at Mountainside in arriving at a total damage award for trade libel.
As to the damages for tortious interference, a different result ensues. A portion of the award of $250,000 is flawed.
Defendants allege two separate errors with respect to the $250,000 awarded on plaintiff's claims for tortious interference and antitrust.[16] First, they claim that the judge erred in calculating the award by erroneously assuming that the $500,000 earned by defendant in both 1995 and 1996 was attributable solely to his vascular surgery work at IGH. The judge then assumed that plaintiff would have earned twenty-five percent of this amount, or $250,000 for the two-year period his privileges had been wrongfully denied.
Defendants correctly note that the evidence at trial demonstrated that: five to ten percent of the total income shown on defendant's tax returns was from income from other sources; only twenty-five to thirty percent of his practice was vascular surgery; and only seventy to eighty percent of his vascular surgery was performed at IGH. Hence, the court erroneously based its twenty-five percent award on defendant's full $500,000 annual income.
Plaintiff responds that defendant noted that only one or two vascular cases each year were performed at a hospital other than IGH. However, the testimony to which plaintiff alludes is deposition testimony in which defendant stated that he had only one or two vascular cases at Newark Beth-Israel each year. Defendant, *840 however, also had privileges at St. Barnabas Hospital. More importantly, in that same deposition and again at trial, defendant admitted that only eighty percent of his practice was at IGH. Plaintiff correctly notes that defendant indicated at his deposition that thirty-five to forty percent of his practice was vascular surgery, rather than the twenty-five to thirty percent figure he gave at trial. However, the judge erroneously assumed that it was 100 percent.
To support the award, plaintiff further argues that the judge should have used thirty percent, not twenty-five percent, as the share of referrals he would have gotten had he been timely granted privileges. He bases this on Patrawalla's estimate of his ability to successfully establish himself at both Mountainside and Valley Hospitals.
According to plaintiff's figures, then, the judge could have awarded him $123,000 in damages for tortious interference, which is only $2000 less than what the court did award. However, as defendants correctly note, the judge awarded plaintiff $250,000, not $125,000. The judge assessed only $125,000 against defendant alone, and then trebled that amount to arrive at the antitrust verdict. Plaintiff has virtually conceded error in the judge's analysis.
Defendants also argue that Patrawalla's optimistic estimate of the amount of business plaintiff could expect to do at IGH was too slender a basis on which to award "lost profit" damages of twenty-five percent. We will not interfere with the award. Mere uncertainty as to damages will not preclude recovery as long as a wrong has been committed and damages have resulted. Tessmar v. Grosner, 23 N.J. 193, 203, 128 A.2d 467 (1957). Defendants' tortious interference with plaintiff's application damaged him as he was wrongly precluded from practicing his profession at IGH. The judge arrived at a figure of twenty-five percent presumably based on all the evidence she heard at trial, both from Patrawalla and from defendant. The judge did not err, but the damages must be recalculated consistent with this opinion.
On remand, the judge must consider yet another element of damages. That is whether plaintiff should also be compensated for the referrals he lost at IGH for the period following the grant of his privileges, but before he resigned. We have remanded on the issue of Mountainside damages; we likewise remand on this issue and consideration as to whether he is entitled to compensation for his lost IGH referrals for that period.
Defendants have also raised the issue of whether plaintiff must elect between treble damages and punitive damages. See St. James v. Future Finance, 342 N.J.Super. 310, 343, 776 A.2d 849 (App.Div.) (holding that a plaintiff could not collect both treble damages under RICO and punitive damages under a breach of fiduciary duty claim), certif. denied, 170 N.J. 388, 788 A.2d 773 (2001). Punitive damages are still viable, and a punitive damage award of $250,000 may stand independently. The issue of damage election is now moot but the punitive award cannot reflect the now rejected antitrust claim. This, too, must be addressed on remand.
Since we have dismissed the antitrust claim, we need not address the issue of IGH's immunity as raised on plaintiff's cross-appeal. Moreover, we have carefully considered plaintiff's contention that the judge erred in dismissing the breach of contract cause of action and conclude that such claim is without merit. R. 2:11-3(e)(1)(E).
Finally, we decline to order that this matter on remand be assigned to a different *841 judge. Since we remand solely on the issue of damages, we perceive of no basis for assigning the matter to a new judge. The trial judge heard the evidence, and may supplement the record as she deems appropriate to arrive at a just damage award consistent with this opinion.
Affirmed in part; reversed in part and remanded for consideration of damages consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] "Defendant" shall refer to Soriano.
[2] Defendant's position title at IGH is also referred to as "division chair." The terms "division chair" and "chief" are interchangeable.
[3] After the recommendation of the department and division chairs, an application proceeds 1) to the credentials committee for a recommendation to 2) the medical executive committee for a recommendation to 3) the board of trustees, which makes the final decision. At the time of plaintiff's application, defendant was not only the division chair but also a member of the medical executive committee as well as a member of the board of trustees.
[4] This attorney indicated at trial that when defendant called him, he told him that a reasonable way to verify the information he had received about plaintiff would be to request a list of his cases for the prior two years. If any case raised a question, then the hospital could request specific medical records. Since the attorney was not admitted as an expert on any issue, the judge considered this testimony only for the limited purpose of determining whether defendant had acted out of malice.
[5] Mortality refers to a patient's death; morbidity refers to complications. Every mortality is discussed at conference.
[6] Plaintiff claimed that the defamatory comments referred to in his original complaint, filed in September 1996, were the ones made by defendant in his October 25, 1995, letter to plaintiff, which was copied to Tiu. It was not until October 1996, when plaintiff received minutes of the MEC meeting, that plaintiff discovered what defendant had said about him at the meeting. Those statements were the subject of plaintiff's amended complaint, filed in August 1997.
[7] On December 5, 1996, plaintiff deposed Syracuse. A few days later, plaintiff received a letter from Dr. Richard A. Kaiser, the head of surgery at Mountainside, advising him that Mountainside had decided to review "selected vascular surgical cases" involving plaintiff's patients at that hospital.
[8] As of trial, most of plaintiff's practice was at Valley.
[9] Defendant originally stated the percentage as ten to fifteen percent. Counsel then restated this percentage as five to ten percent, to which defendant agreed.
[10] Especially since the advent of managed care, many doctors merely referred their patients to surgeons who were on the required provider lists.
[11]  1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. 15 U.S.C.A.  1.
[12]  2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...." 15 U.S.C.A.  2.
[13] The only difference between the federal and state statutes is that the Act does not require that defendant's activity affect interstate commerce. Urdinaran, supra, 115 F.Supp.2d at 492. It is the effect on interstate commerce that supplies the necessary federal jurisdiction under the Sherman Act. McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441, 449-50 (1980).
[14] Although the issue of qualified privilege arose in the context of personal defamation, we discuss the issue of privilege in the context of trade defamation.
[15] In the case of a hospital performing its credentialing function on applicants for surgical privileges, these competing interests and principles have been codified in both federal and state statutes. See N.J.S.A. 2A:84A-22.10(d); 42 U.S.C.A.  11111 and 11112(a).
[16] Although we vacate the antitrust award, we briefly discuss the award since it was integrated into the tortious interference claim.