NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-358                                         Appeals Court


RASS CORPORATION  vs.  THE TRAVELERS COMPANIES, INC., & another.[1]


No. 15-P-358.

Suffolk.     February 24, 2016. - November 10, 2016.

Present:  Katzmann, Maldonado, & Blake, JJ.[2]


Insurance, Coverage, Insurer's obligation to defend, Notice,
     Settlement of claim, Unfair act or practice.  Notice,
     Insurance claim.  Commercial Disparagement.  Trade Secret.
     Libel and Slander.  Consumer Protection Act, Insurance,
     Unfair act or practice, Offer of settlement, Damages,
     Attorney's fees.  Damages, Libel, Wrongful use of trade
     secret, Consumer protection case, Attorney's fees.


     Civil action commenced in the Superior Court Department on
June 7, 2010.

     Motions for summary judgment were heard by Janet L.
Sanders, J., and the case was heard by her.


     Anil Madan for the plaintiff.
     Michael F. Aylward for the defendants.


_____

     [1] Travelers Property Casualty Company of America.

     [2] Justice Katzmann participated in the deliberation on this
case prior to his resignation.

BLAKE, J.  At issue in the present case is whether the defendant insurance companies, The Travelers Companies, Inc., and Travelers Property Casualty Company of America (collectively Travelers), breached their duties to defend, indemnify, and settle in good faith, as to their insured, the plaintiff, Rass Corporation (Rass).  The underlying action, arising out of Rass's decision to cut the underlying plaintiff out of its food marketing and distribution business, alleged that Rass's principal had committed trade libel, defamation, and misappropriation of trade secrets.  After a three-month delay in notice, Travelers agreed to defend the case from that point forward under a reservation of rights that disclaimed coverage of the trade secrets claim, and subject to Traveler's limit on defense counsel's hourly rate.  Rass ultimately settled the case on its own, refusing the insurer's offer to contribute a nominal amount conditioned on a waiver of Rass's right to seek indemnification.  Thereafter, Rass commenced the present action against Travelers, seeking indemnity for the settlement and the reasonable attorney's fees left unpaid by Travelers, and alleging violations of G. L. c. 93A.

Following a bench trial in the Superior Court, the judge allocated $140,000 of the settlement to Travelers for indemnification of the covered claims and found that Travelers owed an additional $25,000 in reasonable attorney's fees.  The

judge also found that Travelers had committed violations of G. L. c. 93A based on its commission of unfair claim settlement practices.  In a summary judgment ruling issued prior to trial, the judge rejected Rass's claim for attorney's fees incurred prior to its notice of the underlying claim to Travelers.  Before us now on the parties' cross-appeals are challenges to the judge's summary judgment ruling, the rulings as to coverage of the underlying claims, the judge's allocation of the settlement, and the finding of a c. 93A violation, along with the judge's related findings as to damages and attorney's fees.  We affirm.

Background.  "We recite the essential facts found by the judge, which we accept 'unless they are clearly erroneous,' . . . and which the parties do not challenge, supplemented by other undisputed information from the record."  Boyle v. Zurich Am. Ins. Co., 472 Mass. 649, 651 (2015) (Boyle), quoting Weiler v. PortfolioScope, Inc., 469 Mass. 75, 81 (2014).

1.  The underlying lawsuit.  Ranbir "Paul" Jaggi has been engaged for several years in the sale of food products through various corporate entities.  In the early 1990s, Jaggi met Neera Tulshian, who is a food chemist based in New Jersey, through his contact with Nugen, a New Jersey food manufacturing plant.  Tulshian, while she was at Nugen, and then through her own company, IAM International, Inc. (IAM), worked with Jaggi to

convert Jaggi's Indian sauce recipes into a "shelf stable" product capable of being sold in jars at grocery stores without refrigeration. Over several years, the two had an arrangement whereby IAM would manufacture shelf-stable simmer sauces, and then deliver the product for distribution by Jaggi, through one of his own entities or a corporate parent. In 2004, Jaggi formed Rass, which is based in Sudbury. Between January of 2004, and January of 2008, Rass purchased $5,445,968.26 worth of simmer sauces from IAM, which it then sold to the Trader Joe's grocery store chain. Tulshian's personal tax returns indicate that her annual income during that period was about $400,000.

In 2007, Tulshian learned that Jaggi, with his brother-in-law, was in the process of setting up his own bottling line that could make the sauces. Knowing that his actions would cut Tulshian out of the business, Jaggi offered Tulshian a stake in the new plant. When that offer failed, Jaggi offered her $100,000. She again refused. Anticipating a problem with his Trader Joe's account, on November 8, 2007, Jaggi wrote an electronic mail message (e-mail) to Cara Yokomizo, a buyer at Trader Joe's. It states, in relevant part:

> "[T]here is an outside chance that the person who is handling this co-packing arrangement for us -- Ms. Neera Tulshian -- may approach you directly for making these sauces. Not only will that be unethical but illegal as well as these are our recipes created by us for Trader Joe's based on our frozen entrée sauces. I

do not foresee that happening but I wanted to give you a heads up to avoid any confusion."

As anticipated, Tulshian contacted Yokomizo and informed her that she was the one who had developed the product. Yokomizo, in turn, told Jaggi that he should contact Tulshian and resolve the issue.

Having learned of the e-mail to Trader Joe's, Tulshian retained an attorney, who sent Rass a demand letter dated December 7, 2007. After negotiation attempts between Jaggi and Tulshian failed, on January 9, 2008, IAM filed a complaint in the Superior Court of New Jersey alleging misappropriation of trade secrets, tortious interference with present and prospective economic advantage, and trade libel. Under the count entitled trade libel, the complaint alleges that Jaggi's statements in the e-mail "constitute trade libel, trade disparagement, and defamation." Jaggi responded by seeking the advice of his own local Massachusetts attorney, and by hiring New Jersey attorney Emery Mishky to defend the IAM lawsuit. Mishky agreed to defend the case at a rate of $275 per hour.

At all relevant times, Rass was insured by a commercial general liability policy issued by Travelers. The policy covered, among other things, claims against the insured for "[o]ral, written, or electronic publication of material that slanders or libels a person or organization or disparages a

person's or organization's goods, products, or services." The policy also required Travelers "to defend the insured against any 'suit' seeking [covered] damages."

On March 6, 2008, Rass notified Travelers of the New Jersey lawsuit. A Travelers senior technical specialist, John Banks, responded by letter dated March 19, 2008. It states that "a potential for coverage" exists under the policy, and that Travelers agrees to defend Rass subject to a reservation of its rights "to deny indemnification for any alleged acts which do not fall within the enumerated personal injury offense . . . or [fall within] any of the exclusions [listed in the policy]." In the letter, Travelers also disclaimed coverage for any claim related to the trade secrets allegations, but acknowledged that the claims based on the e-mail to Trader Joe's obligated Travelers to defend the action. Finally, Travelers agreed to have Mishky remain on the case, but unilaterally set a rate of payment of $200 per hour.

Throughout the duration of the underlying case, Mishky regularly reported to the Travelers personnel assigned to the case, including Banks; Amy Baker, a claims adjustor in Travelers's major case unit specializing in business torts; and John Scott, an attorney from a New Jersey law firm retained as independent monitoring counsel. Despite Tulshian's claim of $675,000 in lost profits and Baker's acknowledgment that no

policy exclusions applied, Mishky's initial assessment of IAM's case was that Travelers had minimal exposure. As for the claims arising out of the e-mail, Mishky applied a common-law defamation analysis. The pretrial reports and notes indicate that he thought it was defensible on the grounds that the e-mail was limited in its publication and expressed only Jaggi's opinion, and because a qualified privilege could apply to the statements made. On the trade secrets claim, Mishky pointed to the fact that Tulshian had done nothing to protect any trade secret she claimed as hers, and the fact that the sauces were made from generic Punjabi recipes that Jaggi had supplied to Tulshian. Nevertheless, as the case neared a July 21, 2009, trial date, in a report dated May 20, 2009, Mishky predicted a possible verdict of $100,000 to $500,000, recommended a settlement range of $100,000 to $150,000, and indicated that the chance of a defense verdict was fifty to seventy-five percent.

On the July 21, 2009, trial date IAM dropped its demand from $675,000 to $200,000, and then to $175,000. Extensive settlement discussions occurred between IAM and Rass, with communications to Travelers inquiring about contribution. Travelers first offered $10,000 on the condition that Rass waive its right to dispute Mishky's reasonable hourly rate. When that offer was rejected, Travelers made a second offer of $20,000 on the condition that Rass waive its right to seek indemnification

under the policy. Rass likewise rejected that offer and, not wanting to lose the opportunity to avoid trial, settled the case for $175,000 without any contribution from Travelers.

2. The present action. Having settled the New Jersey case on its own, Rass filed a complaint in the Superior Court on June 7, 2010, alleging that Travelers had breached its contract and had committed unfair or deceptive acts in violation of G. L. c. 93A, § 2.[3] Following discovery, Rass moved for partial summary judgment as to liability on the settlement and attorney's fees, while Travelers sought a summary judgment ruling limited to its obligation to pay the attorney's fees Rass incurred prior to its March 6, 2008, notice to Travelers of the underlying claim. The judge allowed Travelers's motion and denied Rass's.

A bench trial was held over multiple days in October and November, 2012, at which Jaggi, Baker, and Mishky testified. Rass also hired New Jersey attorney Gregg Paradise, a specialist in intellectual property law, who testified as an expert for Rass on the reasonableness of the settlement and provided his opinion of the viability of IAM's claims under New Jersey law. The focus of Paradise's and Mishky's testimony was that Rass's

---

[3] The judge's finding that two additional counts, claiming breach of the implied covenant of good faith and fair dealing and common-law bad faith, were duplicative of the c. 93A claim is not disputed on appeal.

settlement was reasonable because IAM had a viable trade disparagement claim[4] based on the contents of the e-mail. Counsel for Travelers and Baker, the major case unit adjuster, who is also an attorney, disputed that a trade disparagement claim would be covered under Jaggi's policy because the e-mail did not "disparage[] a person's or organization's goods, products, or services" as provided in the policy language but, rather, disparaged Tulshian herself, or her ownership of the sauces. Counsel for Travelers also emphasized the absence of any written records generated prior to the settlement discussing, or even mentioning, trade disparagement.

Looking at the facts known to the parties at the time of the settlement, the judge concluded that "Rass has proved by a preponderance of the evidence that the settlement in large part (but not entirely) reflected Rass's exposure to plaintiffs' claims for lost profits due to the Trader Joe's e-mail and that these claims were covered." The judge accordingly found that Travelers had breached its contractual duties by failing to contribute $140,000 to the $175,000 settlement. On the attorney's fees issue, the judge found that there was little dispute that Mishky's hourly rate of $275 was reasonable, and

---

[4] Although IAM's complaint states a claim for both trade libel and trade disparagement, the phrases are interchangeable. We shall use the phrase trade disparagement for the remainder of the opinion.

awarded Rass damages for the difference that Travelers had failed to pay, which amounted to $25,000.

Assessing Travelers's conduct in relation to the requirements of G. L. c. 176D, § 3(9), the judge found Travelers's failure to contribute to the settlement, and its failure to pay Mishky's reasonable attorney fees, to be unfair and unreasonable in the face of the facts known to it and reasonably available at the time and, therefore, to constitute a violation of G. L. c. 93A. Rass subsequently requested attorney's fees totaling $676,302.77. The judge awarded half that figure, criticizing counsel for his obfuscating trial tactics and noting that he had repeatedly filed frivolous and unnecessary motions. After incurring more legal expenses for work related to bringing the case to final judgment, Rass submitted an additional motion for an updated fee award seeking another $29,997.94. The judge summarily denied the motion, citing the reasoning stated in Travelers's opposition. These appeals followed. Additional facts will be set forth as necessary.

Discussion. 1. Standards of review. "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." Augat, Inc. v.

Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).  See Mass. R. Civ. P. 56(c), as amended, 436 Mass. 1404 (2002).  As to the parties' remaining claims, we are bound by the trial judge's findings of fact, including all reasonable inferences, that are supported by the evidence.  Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 420 (2005) (Twin Fires).  T.W. Nickerson, Inc. v. Fleet Natl. Bank, 456 Mass. 562, 569 (2010).  Such findings will only be set aside if clearly erroneous.  Mass. R. Civ. P. 52(a), as amended, 423 Mass. 1402 (1996).  "The judge's legal conclusions are reviewed de novo."  Anastos v. Sable, 443 Mass. 146, 149 (2004).

2.  Breach of contract.  a.  Duty to pay pre-notice defense costs.  On Travelers's motion for partial summary judgment, the judge concluded that Travelers had no duty under the policy language to pay for the defense costs Rass incurred prior to notifying Travelers of the underlying claim.[5]  We agree with the judge's ruling.

When an insured fails to comply with its contractual obligation to provide prompt notice of a claim, it is well settled that, unless prejudiced, an insurer nevertheless has a duty to defend the insured.  Boyle, 472 Mass. at 655-658.  There

---

[5] Our analysis on the summary judgment claim is limited to the undisputed facts related to Rass's delayed notice of the claim to Travelers, and Travelers's refusal to pay the fees incurred prior to its receipt of that notice.

is no equivalent body of case law in Massachusetts addressing the related question of when an insurer's obligation to fund that defense begins. The issue has been examined, however, in the Federal District Courts, and in other States, where the consensus is that the insurer bears no such obligation until notice is received. See Hoppy's Oil Serv., Inc. v. Insurance Co. of N. Am., 783 F. Supp. 1505, 1509 (D. Mass. 1992) ("No duty to defend or to participate in a defense can arise before the insurer has notice of the suit against the insured, or at least of the underlying claim and the likelihood of suit"); American Mut. Liab. Ins. Co. v. Beatrice Cos., Inc., 924 F. Supp. 861, 872 (N.D. Ill. 1996) (applying Massachusetts law) (Beatrice Cos.); Windt, Insurance Claims & Disputes § 4:44, at 327-334 (6th ed. 2013) (Windt).

The reasoning supporting the majority position is persuasive. First, an insurer cannot be aware of a duty to defend an insured until notice is given. It would be irrational, then, to conclude that the insurer could breach that duty at a point when it is unaware that the duty exists. Second, when an insurer receives late notice, it is unable to control or minimize costs that have already been incurred. See generally MacInnis v. Aetna Life & Cas. Co., 403 Mass. 220, 223 (1988) (notice of claim provision exists for purpose of allowing insurer to protect its interests); Augat, Inc. v. Liberty Mut.

Ins. Co., 410 Mass. 117, 123 (1991) (where notice of claim did not occur until after underlying settlement had been executed and judgment entered, insurer not liable under policy, regardless of prejudice, because "it was too late for the insurer to act to protect its interests"). Here, during the three-month delay, Travelers was unable to recommend counsel, negotiate a fee rate, or take other steps to protect its interests and minimize losses.

Finally, if the opposite result were reached, an insured could be incentivized to delay providing notice so as to control its own defense for as long as possible, knowing that, absent prejudice, the insurer would have to cover the bill for reasonable defense costs. See Beatrice Cos., supra at 873-874 ("There are tactical reasons why an insured may want to withhold the defense from an insurer that clearly covers a risk. For example, especially in a high profile case, an insured may not want to lose control of events to the insurer").

For all of these reasons, the judge properly allowed Travelers's partial motion for summary judgment on the issue of defense costs incurred prior to notice.[6]

---

[6] We reject Rass's alternative argument that Travelers became bound to pay the prenotice defense costs on the ground of waiver due to Travelers's inadvertent payment of a portion of Mishky's prenotice fees. To establish waiver, Rass must demonstrate that the payment amounted to the intentional relinquishment of a known right. See Rotundi v. Arbella Mut.

b. <u>Duty to indemnify</u>. Because the underlying case did not proceed to judgment, but settled, Travelers's liability under the policy and, in turn, its duty to indemnify Rass for covered losses were not determined on the record in the underlying case.[7] In such instances, the court is left to determine an insurer's duty to indemnify by looking to the basis for the settlement; i.e., whether any portion of the settlement was made in compensation for the acts alleged in the underlying complaint, and, if so, whether those acts are covered under the policy language. See <u>Travelers Ins. Co</u>. v. <u>Waltham Indus. Labs. Corp</u>., 883 F.2d 1092, 1099 (1st Cir. 1989); Windt, <u>supra</u> at § 6:31, at 312. If any part of a settlement is for covered claims, the court is then charged with allocating the settlement between covered and noncovered claims. See <u>Allmerica Fin. Corp</u>. v. <u>Certain Underwriters at Lloyd's, London</u>, 81 Mass. App. Ct. 674, 681 (2012) (remanding matter for, inter alia, allocation of damages between claims covered by insurance and those not covered by insurance) (<u>Allmerica</u>).

---

<u>Ins. Co</u>., 54 Mass. App. Ct. 906, 907 (2002). The record is devoid of any facts supporting such an argument.

[7] When an underlying complaint is tried to a jury, the judge may assist the process of allocating covered and uncovered claims by providing the jury with a special verdict form. See <u>Liquor Liab. Joint Underwriters Assn. of Massachusetts</u> v. <u>Hermitage Ins. Co</u>., 419 Mass. 316, 323 (1995).

The relevant inquiry in determining an insurer's obligation in these circumstances is "how the parties to the settlement viewed the relative merits of the plaintiff's claims at the time of the settlement and whether, if the insured settled without the carrier's approval, the settlement amount was reasonable." Windt, supra at § 6:31, at 310-311. See American Home Assur. Co. v. Libbey-Owens-Ford Co., 786 F.2d 22, 31 (1st Cir. 1986) (noting on issue of allocating settlement that court "should accept whatever evidence is available regarding the intent behind the settlement decision"); Luria Bros. & Co. v. Alliance Assur. Co., 780 F.2d 1082, 1091 (2d Cir. 1986) (insured need not establish actual liability, so long as potential liability is shown to exist on facts known to insured at time of settlement); Nordstrom, Inc. v. Chubb & Son, Inc., 820 F. Supp. 530, 535 (W.D. Wash. 1992) ("An insurer is not entitled . . . to re-litigate an underlying action following a settlement"). See also Allmerica, supra.

As for the burden of proof, it rests with the insured, here Rass, to prove "the compromise of claims that were covered by the general insuring clause." Continental Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 376 (1st Cir. 1991), quoting from Windt, supra at § 6.29, at 351.[8]

---

[8] Rass argues that, based on Travelers's failure to pay Mishky his reasonable hourly rate of $275, Travelers breached

Having set out a legal framework, we turn to the issues before us. Here, the judge determined that Rass reasonably settled the IAM case based on its probable liability for both the e-mail claims and the trade secrets claim. Having determined that the e-mail claims were covered, but the trade secrets claim was not, the judge assigned an allocation. On appeal, the parties agree that the claim for misappropriation of trade secrets is not covered under the policy and, therefore, Travelers has no duty to indemnify whatever portion of the settlement is attributable to that claim. As to the claims of defamation and trade disparagement arising from the e-mail, however, the parties' positions diverge. While both agree that defamation is covered under the policy, and that the e-mail may be understood to support a claim for defamation, Travelers maintains that, at the time of settlement, the affirmative

---

its duty to defend and, in so doing, shifted the burden of proof from the insured to the insurer. While Rass is correct that a breach of the duty to defend causes the burden to shift, see Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 764 (1993), no such breach occurred here. Unlike Polaroid, Travelers defended the suit against Rass, albeit at a lower hourly rate, with no resulting prejudice incurred by Rass as a result of the payment dispute. See ibid. (burden of proof should shift to insurer "[b]ecause an insurer should be liable for the natural consequences of a breach of contract that places its insured in a worse position"). The only consequence flowing to Travelers in unilaterally setting the lower rate is its liability to Rass for the difference between the amount paid and the amount owed under the reasonable rate, which the judge found and is undisputed on appeal. See Citation Ins. Co. v. Newman, 80 Mass. App. Ct. 143, 144 n.4 (2011).

defenses to the defamation claim were considered to be so strong that little if any portion of the settlement can be allocated to that claim.  Travelers also maintains that, while liability for the tort of disparagement is covered under the policy, the e-mail cannot be understood as giving rise to such a claim or as falling within the policy coverage.  Thus, Travelers argues that no portion of the settlement can be attributed to the disparagement claim.  Rass, for its part, asserts that it faced no liability for misappropriation of trade secrets, and that the judge should have allocated the entire settlement to the e-mail claims.

We conclude that the e-mail gave rise to a covered disparagement claim as well as a covered defamation claim, and we discern no reason to disturb the judge's allocation of the settlement as between the e-mail claims and the trade secrets claim.  We address each point, in turn.

i.  <u>Viability and coverage of the e-mail related claims</u>. Travelers argues that the statements made in the e-mail do not support a claim for trade disparagement because Jaggi's statements concern Tulshian's ownership of the sauces, but do not disparage their quality.  Travelers also argues that a disparagement claim under this set of facts is not a claim for disparagement of "goods, products, or services," as required by the language of the policy.  The arguments fail, as the relevant

case law, facts, and policy language support coverage for the disparagement claim, as well as the defamation claim.

Disparagement and defamation are distinct torts.  See generally Dairy Stores, Inc. v. Sentinel Publishing Co., 104 N.J. 125, 133-134 (1986), citing Prosser & Keeton, Torts § 111, at 771, and § 128, at 962-964 (5th ed. 1984) (Prosser & Keeton).[9] Disparagement, or trade libel, requires proof of a publication of a false statement "derogatory to the quality of a plaintiff's business, of a kind calculated to prevent others from dealing with [her], or otherwise to interfere adversely with plaintiff's relations with others."  Patel v. Soriano, 369 N.J. Super. 192, 246-247 (App. Div. 2004).  "The communication must be made to a third person and must play a material part in inducing others not to deal with plaintiff."  Id. at 247.   Defamation, on the other hand, requires a statement that "is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him."  Lynch v. New Jersey Educ. Assn., 161 N.J. 152, 164-65 (1999), citing Restatement (Second) of Torts §§ 558, 559 (4th ed. 1977).  "[T]he threshold issue in any defamation case is whether the statement at issue is reasonably susceptible of a defamatory meaning."  Printing Mart-Morristown

---

[9] As the underlying lawsuit was filed in New Jersey, the parties do not dispute the application of its laws to the issue of coverage of the claims set out therein.

v. Sharp Electronics Corp., 116 N.J. 739, 765 (1989).  Simply put, disparagement concerns the reputation of a business, while defamation concerns an individual's personal reputation in the community.

Depending on the individual facts involved in any given case, there can be a significant overlap in the causes of action.  See Prosser & Keeton, supra at 964-965 (noting that "[m]any statements effectuate both harms"); Dairy Stores, Inc. v. Sentinel Publishing Co., supra at 133 (noting overlap in causes of action); Patel v. Soriano, supra at 248 (same).  Such is the case here, where, as the judge found, and we concur, the statements went to both personal and business reputation. [10]  In the e-mail, Jaggi insults Tulshian's personal reputation by falsely stating that Rass owns the sauces and by calling her actions "illegal" and "unethical."  The statements also concern her business dealings through her company.  As the principal of IAM, Tulshian was the face of the company, and a personal insult to her equally could be seen as a disparagement of the "character" of her business organization that would prevent

_____

[10] We are in as good a position as the judge to read the e-mail and determine if coverage is triggered based on its contents.  We add, nonetheless, that our reading and interpretation accords with that of the judge.

others from doing business with her.[11]  See Prosser & Keaton, supra at 964.  Because a statement about a business, itself, may fall within the realm of disparagement, Travelers's arguments about the absence of any disparagement of the product's quality are irrelevant.[12]  In sum, the e-mail gave rise to possible defamation and disparagement claims.[13]

As to coverage for disparagement, Travelers argues that because IAM's business with Rass was not a "good, product or service" disparaged by Jaggi's e-mail, any trade disparagement

_____

[11] As aptly stated by the judge:  "[T]he Trader Joe's email was impossible to deny: it was admittedly sent and it said what it said.  If the email were simply seen as a way to besmirch Tulshian's personal reputation, then she would be hard-pressed to show damages.  But the email did more than that, targeting Tulshian's business and disparaging her products.  Its message was also clear:  Trader Joe's should not deal with Tulshian or IAM directly."

[12] Travelers cites Heritage Mut. Ins. Co. v. Advanced Polymer Tech., Inc., 97 F. Supp. 2d 913 (S.D. Ind. 2000), in its brief in support of the proposition that insurers should bear no responsibility for covering claims involving a dispute over ownership or title under a policy providing coverage for the disparagement of goods, products, or services.  The case is inapposite, as there was no allegation that the insured in that case had disparaged the character of the opposing party's business or product.  It was for that reason that the court held that no coverage existed under similar policy language.  See id. at 931-933.

[13] Travelers makes much of the fact that, prior to the present action, everyone involved viewed the e-mail as only giving rise to a highly defensible defamation claim.  Whether there were defenses, however, is relevant only to the extent that Travelers can show that Jaggi thought the defamation claims were so defensible that he settled only due to his liability on the trade secrets claim.  That showing has not been made, and is contrary to the facts found.

claim is not covered under the language of the policy. "It is . . . appropriate, in construing an insurance policy, to consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Hazen Paper Co. v. United States Fid. & Guar. Co., 407 Mass. 689, 700 (1990). "If there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it." Ibid. In this case, where Jaggi called into question the legal status of any sauces Tulshian might produce, and viewing the policy in Rass's favor, an objective and reasonable policyholder would expect any disparagement claim arising from those facts to be covered under the policy language.[14]

Accordingly, we conclude that all claims arising out of the e-mail were covered under the relevant policy language.

ii. Allocation. Based on the undisputed record and credible testimony, the judge allocated eighty percent, or $140,000 of the $175,000 settlement, to the e-mail-related claims, with the remainder to the trade secrets claim. Upon an extensive review of the record and the judge's findings, we see no reason to disturb the allocation reached.

---

[14] Although we review the coverage question de novo, we note that we reach the analogous conclusion as the judge.

Several facts point to the strength of the claims raised by the e-mail, and Rass's consideration of them at the time of the settlement. First, Rass knew that IAM was seeking $675,000 in losses. That figure could be directly related to the e-mail, which impeded Tulshian and IAM from selling to Trader Joe's. In other words, unlike the trade secrets claim, the e-mail claims were supported by direct evidence linking Rass to IAM's lost business. Mishky's pretrial analysis reflected this concern, with a predicted possible verdict of $100,000 to $500,000 and a recommended settlement range of $100,000 to $150,000. Second, and particularly telling of Rass's state of mind on July 21, 2008, is the fact that the settlement included, at Tulshian's urging, a condition that Rass recant its prior statement to Trader Joe's, but included no assignment of any trademark, trade secret, or other right.

The record likewise supports the judge's conclusion that the trade secrets claim formed some small basis for the settlement. Contrary to Rass's assertions that it faced no liability for trade secrets, the four counts related to trade secrets all survived until trial, which was scheduled to commence on the day the settlement was reached. Mishky, who testified on behalf of Rass at trial, noted that any claim that reaches a jury carries some risk, and that the trade secrets claim carried a five to ten percent chance of a plaintiff's

verdict. Mishky's testimony reflects the fact that a jury can and often does act unpredictably, and a settlement of claims reflects a compromise to avoid exposure at trial. See generally Reading Co-Op. Bank v. Suffolk Constr. Co., 464 Mass. 543, 551 (2013); Curcuru v. Rose's Oil Serv., Inc., 66 Mass. App. Ct. 200, 217 (2006).

3. General Laws c. 93A. In its cross-appeal, Travelers disputes the judge's finding of a violation of G. L. c. 93A. Rass, on the other hand, argues that multiple damages are warranted based on Travelers's actions, and that the judge erred in reducing its award of attorney's fees, and in declining to award supplemental attorney's fees.

a. Violation of c. 93A based on unfair claim settlement practices. Liability under G. L. c. 93A, § 2, is based upon the employment of "unfair or deceptive acts or practices in the conduct of any trade or commerce" while G. L. c. 176D, § 3, sets forth unfair acts or practices specific to the insurance industry. See Silva v. Steadfast Ins. Co., 87 Mass. App. Ct. 800, 803 (2015) (Silva). Among those practices enumerated in c. 176D, § 3(9), are unfair claim settlement practices, including:

> "(d) [r]efusing to pay claims without conducting a
> reasonable investigation based upon all available
> information; . . .

"(f) [f]ailing to effectuate prompt, fair and
equitable settlements of claims in which liability has
become reasonably clear; [and]

"(g) [c]ompelling insureds to institute litigation to
recover amounts due under an insurance policy by
offering substantially less than the amounts
ultimately recovered in actions brought by such
insureds."

G. L. c. 176D, § 3(9), as amended by St. 2012, c. 208, § 21.  "A
violation of G. L. c. 176D, § 3(9), itself establishes a
violation of G.L. c. 93A unless the injured party is 'engage[d]
in the conduct of any trade or commerce.'  See G. L. c. 93A,
§§ 9(1), 11."  Boyle, 472 Mass. at 661.  In that case, as here,
a violation of c. 176D, § 3(9), provides evidence of an unfair
or deceptive practice in violation of c. 93A, but is not
conclusive.  See Silva, supra at 803-804, citing Northern
Security Ins. Co. v. R.H. Realty Trust, 78 Mass. App. Ct. 691,
696 n.12 (2011).  "[W]hether a particular set of acts, in their
factual setting, is unfair or deceptive is a question of fact,"
which we review for clear error.  See Klairmont v. Gainsboro
Restaurant, Inc., 465 Mass. 165, 171 (2013), quoting Casavant v.
Norwegian Cruise Line Ltd., 460 Mass. 500, 503 (2011).

The judge made the following findings of fact in support of
her conclusion that Travelers had committed unfair claim
settlement practices in violation of c. 93A.  First, Travelers,
by its statements and conduct, acknowledged that it would be
required to indemnify Rass if IAM prevailed on its e-mail-

related claims.[15] At that time Travelers also was aware, or should have been aware, based on its duty to investigate, of the strength of the e-mail-related claims and Rass's likely exposure to a judgment in the six figures. Nevertheless, Travelers offered a settlement contribution far below Rass's likely exposure. Second, Baker attempted to condition that inadequate contribution on a waiver of Rass's right to seek attorney's fees or indemnification. By these acts, Travelers failed to effectuate a fair and equitable settlement of claims in which liability had become reasonably clear. See G. L. c. 176D, § 3(9)(d), (f). Third, by surrendering control of the defense to the insured under a reservation of rights, yet at the same time refusing to pay Mishky's hourly rate, which was reasonable, Travelers unfairly compelled Rass to seek the unpaid fees through litigation.[16] See G. L. c. 176D, § 3(9)(g). See also

---

[15] In so finding, the judge clarified that Travelers's acts were not the result of a plausible, good faith, yet ultimately incorrect interpretation of the policy at issue. Contrast Premier Ins. Co. of Massachusetts v. Furtado, 428 Mass. 507, 510 (1998), citing Gulezian v. Lincoln Ins. Co., 399 Mass. 606, 613 (1987).

[16] Quoting from another decision of the Superior Court, the judge sensibly observed that "an insurer cannot reserve its rights and thereby surrender control of the defense, and still reasonably expect that it will pay the same amount of legal fees that it would have paid had it accepted coverage and retained control of the defense. Through its reservation of rights, the insurer's duty to defend is transformed into a duty to reimburse its insured for reasonable attorney's fees incurred by the insured's chosen counsel."

Citation Ins. Co. v. Newman, 80 Mass. App. Ct. 143, 144 n.4 (2011) ("reasonable charges are to be assessed with reference to market rates; an insurer may not insist on paying only the discounted rate it has been able to negotiate with its panel of attorneys").

The findings are well supported by the record, and demonstrate a pattern of unfair conduct on the part of Travelers in violation of both c. 176D and c. 93A.  See R.W. Granger & Sons, Inc. v. J & S Insulation, Inc., 435 Mass. 66, 75-78 (2001); MT "Baltic Commander" Schiffahrtsgesellschaft MBH & Co. KG v. Massachusetts Port Authy., 918 F. Supp. 2d 105, 113-114 (D. Mass. 2013).

b.  Willful or knowing violation.  General Laws c. 93A, § 11, provides that, upon a finding of a violation of c. 93A, "recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation" (emphasis added).  To be wilful or knowing, a violation need not be malicious, but must constitute more than negligence.  Within that range is conduct that is "intentionally gainful," McGonagle v. Home Depot U.S.A., Inc., 75 Mass. App. Ct. 593, 600 n.9 (2009), or demonstrates a wilful recklessness or conscious,

knowing disregard for its likely results, see <u>Gore</u> v. <u>Arbella Mut. Ins. Co</u>., 77 Mass. App. Ct. 518, 531-532 (2010).

Here, noting "the last minute nature of the demand . . . coupled with Travelers's earlier reliance on Mishky's evaluations" the judge declined to find a wilful or knowing violation justifying multiple damages. That conclusion comports with the judge's findings of negligence on the part of Travelers relative to its investigative obligations, and in its reliance on Mishky's overly optimistic reports. Yet, as to the settlement contribution offered, and the refusal to pay Mishky's hourly rate, the judge characterized Travelers's tactics as exerting leverage, and found them to be "extortionate" and without "good faith." Rass argues that such findings compel an award of multiple damages. We disagree.

"Whether the defendants violated c. 93A in a wilful or knowing manner was a matter for the judge," <u>Kattar</u> v. <u>Demoulas</u>, 433 Mass. 1, 15 (2000), which we review for an abuse of discretion, <u>Clark</u> v. <u>Leisure Woods Estates, Inc</u>., 89 Mass. App. Ct. 87, 94 (2016). "[B]ecause evidence will support a particular finding does not require that the finding be made." <u>Kattar</u> v. <u>Demoulas</u>, <u>supra</u> at 16. Here, while an award of multiple damages arguably may have been supported by some of the findings, the judge was well within the range of her discretion in declining so to order, particularly in consideration of her

experience with the case in its entirety.  See ibid., citing Clegg v. Butler, 424 Mass. 413, 420 (1997) (judge's c. 93A findings will not be disturbed unless clearly erroneous).

c.  Attorney's fees.[17]  On appeal, Rass strongly objects to the reduction of its fee submission by half and the denial of its motion for supplemental fees.  Travelers challenges the fee award as well, arguing that Rass should not be awarded fees for time spent on work unrelated to the c. 93A claim.

A trial judge is owed substantial deference in the award of reasonable attorney's fees, having witnessed the parties, counsel, and case being tried firsthand.  See Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 629 (1978); Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993) (reasonable attorney's fee award "is largely discretionary with the judge"); Twin Fires, 445 Mass. at 431.  Employing the "lodestar" method, Ross v. Continental Resources, Inc., 73 Mass. App. Ct. 497, 515 (2009), a judge "should consider the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and

---

[17] General Laws c. 93A, § 11, provides that, if a violation of c. 93A, § 2, has been established, the plaintiff "shall . . . be awarded reasonable attorneys' fees and costs incurred in said action."

the amount of awards in similar cases." Linthicum v. Archambault, 379 Mass. 381, 388-389 (1979) (Linthicum). See T. Butera Auburn, LLC v. Williams, 83 Mass. App. Ct. 496, 503 (2013).

Here, the judge provided several reasons for her substantial reduction of the fees requested. She noted that the case generally did not raise complex legal issues, but where there was complexity she was hindered rather than helped by Rass's submissions. Further, Rass made submissions that were outside of the procedural rules and frivolous, and which continued to press arguments that had already been decided or were plainly incorrect. As an example, the judge noted the fifty hours billed for Rass's motion for summary judgment, despite the "near impossibility of prevailing on such a motion." Finally, the judge remarked on the excessive and duplicative time Rass's counsel billed for certain pleadings and motions. As for the supplemental fee request, the judge denied the motion for the reasons cited in Travelers's opposition.

It is apparent from the record that Rass overwhelmed the court with numerous filings of dubious value, and then submitted voluminous, detailed billing statements for that work. In her application of the Linthicum factors, the judge was well warranted in reducing the fees requested by a large percentage on that basis. In doing so, she was not required to provide an

hour-by-hour accounting of the result reached.  See Twin Fires, supra at 429-430 (upholding a forty-five percent reduction of fee award where plaintiff had submitted overwhelming and unhelpful billing materials, as it was not judge's role "to sort out the plaintiffs' perplexing submission.  To do so would [be] a poor use of judicial resources"), citing Berman v. Linnane, 434 Mass. 301, 303 (2001) (judge not "required to review and allow or disallow each individual item in the bill, but could consider the bill as a whole").  It is also apparent that no apportionment of the fees was required between the c. 93A and breach of contract claims, as they arose from the same primary conduct or chain of events.  See Castricone v. Mical, 74 Mass. App. Ct. 591, 604 (2009), and cases cited.  On the motion for supplemental fees, Travelers's opposition argued that the additional fees were for unnecessary work.  Upon review, the judge's denial on those grounds was not an abuse of her substantial discretion.[18]

Judgment affirmed.

---

[18] Because we affirm the judgment below, we decline to award attorney's fees to Rass.